## Middleton v. Commonwealth.

(Decided September 23, 1924.)

### Appeal from Knox Circuit Court.

1. Homicide—Evidence of Conspiracy Held to Justify Instruction.— In homicide case, evidence of conspiracy between defendants held sufficient to justify instruction on that question.

2. Conspiracy—Joint Assent of Minds Must be Shown.—To establish conspiracy, there must be shown by facts or circumstances joint assent of minds of accused to commit criminal act charged.

3. Conspiracy—May be Shown by Circumstances, and Question is for Jury.—Conspiracy may be shown by circumstances from which jury may infer its existence, and when circumstances are reasonably inducive of that inference, it is for jury to determine whether it did or did not exist.

4. Homicide—Failure to Give Instruction that, if Defendants were Summoned to Assist in Arresting Deceased, they had Right to Enter Train Armed for that Purpose Not Erroneous.—In prosecution for murder, court did not err in not giving instruction that, if defendant and codefendants were summoned by deputy sheriff to assist in arresting deceased, they had right to enter train armed for that purpose, where according to defendants' own evidence, shooting was not done in attempt to arrest deceased, but in self-defense, before he was notified that defendant was seeking to arrest him.

5. Homicide—Instruction Qualifying Right of Self-Defense in Case of Conspiracy Held Proper.—Instruction qualifying defendant's right to be acquitted on ground of self-defense in case jury found conspiracy held not erroneous.

6. Criminal Law—That Deceased had Previously Killed Brother of Accused Competent Only to Show Motive.—Evidence that deceased had on day of the killing, previously killed defendant's brother was competent only to show motive defendant had for killing deceased.

7. Criminal Law—Written Instruction Concerning Purpose of Evidence Held Proper.—Instruction that evidence that deceased had, on day of killing, previously killed defendant's brother was competent only to show motive was not erroneous, though given in writing instead of orally when the evidence was admitted.

8. Criminal Law—Argument of Counsel Held Improper But Not Prejudicial.—Objection should have been sustained to argument of prosecuting attorney that he hoped that there was no member of the jury so corrupt as to be in favor of an acquittal, but failure to do so was not prejudicial error.

JAMES D. BLACK, H. H. OWENS, W. A. BROCK and J. S. GOLDEN for appellant.

FRANK E. DAUGHERTY, Attorney General, and GARDNER K. BYERS, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY SANDIDGE, COMMISSIONER—
Affirming.

The appellant, Calvin Middleton, prosecutes this appeal from a judgment of the Knox circuit court imposing upon him ten years' imprisonment in the state penitentiary. He was tried under an indictment which charged him and Milt Middleton, William Middleton, James F. Middleton and Ed. Bingham with murder by killing one Denny Williams. The indictment charged that appellant, Calvin Middleton, as principal, killed Williams and that the other four named aided and abetted him; and it also charged that the five of them conspired to do so and killed Williams pursuant to and in furtherance of the conspiracy. A severance was had and the Commonwealth elected to try Calvin Middleton, with the result above indicated. The trial was had in Knox county on a change of venue.

Numerous and vigorously insisted reasons are advanced for appellant as authorizing and demanding a reversal of the judgment appealed from. We shall not undertake to discuss each separate reason so advanced, as presented to us by the brief for appellant, but shall group the questions raised with a discussion of the facts relative to and our conclusions upon them as may be hereinafter indicated.

It is strongly contended for appellant that there was not sufficient evidence of a conspiracy existing between the defendants to justify an instruction on that question. A consideration of that question makes it necessary to summarize the facts proved upon the trial of the case. It appears that about four o'clock in the afternoon of the 10th day of August, 1923, Denny Williams killed Hiram Middleton at a little mining town known as "Kildav,"

in Harlan county, Kentucky. Within ten or fifteen min-
utes thereafter Williams was arrested by Ike Lane, a
deputy sheriff of Harlan county, and taken by him to
Evarts, a railroad station on the railroad leading to
Harlan, the county seat of the county. His purpose was
to take Williams to the county seat to be dealt with for
the killing of Hiram Middleton. Before reaching Evarts
Lane called to his assistance Buckner Howard, another
deputy. They boarded the first passenger train that ran,
and in passing some little railroad station another deputy
sheriff boarded the train who was called to the assistance
of the two deputies in charge of Williams. There was
on the same train a brother-in-law of Hiram Middleton,
whom Williams had killed, and he was requested by Lane
to accompany them to Harlan to see that Williams was
safely delivered to the authorities. Williams, the man
under arrest, and three of those who held him under ar-
rest, occupied the first two seats in the rear coach of the
train on the right side of the aisle, the two seats having
been turned together. Williams and one of the deputy
sheriffs were sitting with their backs to the door, Wil-
liams being next to the window, while the other two were
sitting facing them. The train stopped at Verda and,
after the usual discharging and taking on of passengers,
started again on its way to Harlan. Immediately after
the train started a commotion arose in the coach in which
the prisoner and the officers were riding, someone calling
out: "There they come; there will be trouble now." The
deputy sheriffs in charge of Williams jumped immediately
to their feet and in looking through the door saw the ap-
pellant, Calvin Middleton, and one or two of the other
Middletons (jointly indicted with him) in the vestibule of
the train approaching the door. Lane and Howard im-
mediately went to the door and held it to prevent the
Middletons entering the coach and called to them not to
come in and not to shoot, that they had Williams under
arrest. The Middletons were armed with pistols and
some of those who had Williams under arrest called to
him to lie down between the seats. Some of the wit-
nesses testified that Williams called to the officers who
had him under arrest: "Are you going to let them shoot
me down; are you going to protect me?" Calvin Middle-
ton made no response to the officers but, by a motion of
his head to one side, indicated that they were to stand
out of range and began firing at Williams. He fired five

or six shots in rapid succession through the glass door of the train, all of which struck in or about the back of the seat in which Williams was sitting.    None of these shots appear to have hit Williams.    When Middleton had discharged the last load from his pistol, Williams jumped through the window next to which he had been sitting and ran for his life.    The Middletons, charged with the conspiracy, all left the train on the same side from which Williams escaped and as he ran the shooting began again. He ran something over 100 yards from where he had left the train and was then shot down.    Only one shot struck him and from its effects he soon died.    The estimate as to the number of shots fired at Williams varied, some putting it as high as forty, others as low as ten.    When the shooting began on the train it was stopped again, and, in the great confusion that arose following the shooting on the train and the efforts of the passengers to find places of safety for themselves, no witness was able to or did testify as to the identity of any person who fired any of the shots at Williams after he jumped from the train, except it was proved that Ed. Bingham, one of those jointly indicted, fired one or perhaps two  shots. Calvin Middleton, who began the shooting, is a brother of the Hiram Middleton whom Williams had killed that same afternoon.    Williams was killed about an hour and a half after he had killed Hiram Middleton.    Milt Middleton, William Middleton and James F. Middleton were cousins of the man whom Williams had killed.    Calvin Middleton was armed with a .45 caliber Colt's revolver. Milt and William Middleton were armed, each having a .38 Luger pistol; James F. Middleton was armed with a .38 special, while Ed. Bingham had and shot at Williams with a .45 Colt's automatic.    It was shown that the Middletons all learned of Denny Williams having killed Hiram Middleton between that occurrence and the time when the train on which Williams was being carried to Harlan reached Verda.    It was shown that the four of them, armed as above indicated, were at the railroad station some time before the train arrived.    While at the station waiting for the arrival of the train some of them carried their guns in their hands, while others of them had their guns in pockets so disposed that the guns could be seen.    It was shown by the Commonwealth that when the train stopped, after the passengers for Verda alighted, the four Middletons, with their weapons,

boarded it and proceeded to go through the train as if searching for someone. It was shown that immediately upon their discovering Williams, although the officers who had him under arrest attempted to prevent it, as above indicated, appellant, Calvin Middleton, opened fire on Williams; and that when he did so the other three were in his immediate presence. It was shown by the deputy sheriff, Lane, that Calvin Middleton, who began the shooting, knew beyond question that Lane was a deputy sheriff. It was proved by William York, within a few steps of whose home Williams fell when shot down, that attracted by the shooting he ran to his kitchen door and that he saw appellant, Calvin Middleton, and some one else whom he did not know, and that he heard Middleton say: "That shot got him." It was proved by other witnesses that after the shooting was over Calvin Middleton was seen in an alley that leads from the railroad right of way to the pike near which Williams fell. Appellant, Calvin Middleton, admitted firing five shots at Williams while on the train, but he denied that he shot any more or that he knew who fired any of the other shots. He denied the statement attributed to him by the witness York, and denied that he went to the place indicated by the witness York as the point where he was seen. Appellant sought to justify his shooting at Williams while on the train upon the ground of self-defense and apparent necessity. He stated that he had been summoned by Clarence Sexton, a deputy sheriff who resided at Verda, to go and help arrest Williams; that news had reached them of Williams having killed his brother and that he had made his escape. The other Middletons, jointly indicted with Calvin, all likewise testified that they had been summoned by the deputy sheriff, Sexton, to assist in arresting Williams, and that they had been directed by him to be at the railroad station at Verda when the train should run and search it to see whether Williams was making his escape on the train. They proved by Sexton, the deputy sheriff, that he had summoned them to help arrest Williams, and that he had directed them to be at the station and to search the train when it should come through. The credibility of this deputy sheriff on that subject was seriously affected by proof in rebuttal for the Commonwealth from Blair, the high sheriff of Harlan county, which flatly contradicted his testimony. After properly laying the grounds for the contradiction, the sheriff testified that

immediately after Williams was killed Sexton called him by telephone and told him of the occurrence and told him that he had not summoned any of the Middletons to help him arrest Denny Williams; that when he got to the station the Middletons were there all armed; that he tried to keep them from boarding the train but could not do so because they outnumbered him and were armed; and that when he found he could not keep them off the train he warned those about the station to stand back as there would be trouble. He was contradicted on this subject also by sheriff Blair and Gillis Metcalfe, a policeman of Harlan, who went immediately to the scene of the killing after Sexton telephoned the sheriff. They stated that Sexton made the same statement to them in the presence of each other when they reached Verda some two hours after Williams was killed. He was contradicted also about having summoned the defendants to help arrest Williams by sheriff Blair, who stated that on the day of the examining trial of the defendants Sexton told him that the defendants were trying to get him to swear that he had summoned them to help arrest Williams and directed them to go upon the train for that purpose, but that he did not do so and that he was not going to swear any lies in the case for them. The Middletons all swore that they did not know that Williams had been arrested and that, on the other hand, they had been informed that he had escaped and was fleeing. They also testified that they did not know that any of the three deputy sheriffs who had Williams in charge at the time were deputy sheriffs. As a justification upon the grounds of self-defense for shooting at Williams as he did, Calvin Middleton testified that as he started to enter the rear coach of the train searching for Williams, after having been directed to do so by deputy sheriff Sexton, Milton Middleton, who was with him and immediately ahead of him, called to him, "watch out," and that he looked immediately into the coach and saw Ike Lane, Buckner Howard and Williams raise up and he saw Williams grab at Buckner Howard's pistol and that he, thinking he was in danger of being shot by Williams, immediately raised his pistol and began to fire. Buckner Howard, who was introduced for the Commonwealth, in a measure corroborated Middleton as to Williams grabbing at his pistol; but he testified that after Williams grabbed at his pistol he left the seat where they were sitting and

went to the door and called to Middleton not to shoot and held the door to prevent Middleton entering, and that Middleton began to shoot after these things happened. A number of other witnesses testified for the Commonwealth, including Ike Lane and Henry McKnight, the other two deputy sheriffs, and Ewell King, a brother-in-law of Hiram Middleton, whom Williams had killed that afternoon, and a number of others who were in the same coach, that Williams made no attempt to get Buckner Howard's pistol and did nothing when the Middletons were seen and the commotion arose in the coach except to lie down between the seats and call on the officers who had him under arrest to protect him from being shot down. It is significant that of the three or four others named by deputy sheriff Sexton as having been summoned by him to help arrest Denny Williams on the occasion in question, only one of them, Campbell Redwine, testified upon the trial of the case. It is significant also that Redwine testified that, after having gone to the railroad station at Verda and seeing the Middletons there armed, he left the station and went to his home and reached it, about a quarter of a mile distant, before the train came and the shooting occurred that resulted in the death of Denny Williams. None of the other persons whom Sexton testified he summoned either testified in the case or appear to have gone with Sexton and the Middletons to the railroad station at Verda. It is significant also that Sexton, the deputy sheriff, did not lead his posse in searching for the prisoner supposed to be escaping on the train; that he did not go to the conductor of the train when it reached Verda and request that the train be held until he could search for the escaping murderer. According to the testimony of Sexton, when the train reached Verda, he left his posse and alone went to the baggage coach to see if he could find the fleeing criminal there. With reference to the defendant, Bingham, it appears that he came into Verda on the same train and in the same coach in which Williams and the three deputies who had him in charge were riding. He admits that he was informed before reaching Verda that Williams was on the train. He admits that he was the first man to alight from the train when it reached Verda and went immediately into the crowd where the Middletons were. He testified that Sexton summoned him as soon as he alighted from the train. Before the battle was over that resulted

in the death of Williams, Bingham is shown to have fired one and perhaps two shots from the .45 Colt's automatic pistol with which he was armed. The transcript of the testimony in this case contains over six hundred pages of typewritten matter and the foregoing is a brief summary of the same. Many other unimportant and disconnected facts were proved which we deem it unnecessary to mention. The reading of the transcript of evidence has impressed the court that the witnesses for the Commonwealth were most unwilling witnesses and testified to the facts above indicated only when compelled to do so.

In the face of the facts disclosed by the record, as above indicated, we are asked to say that there was not sufficient evidence of conspiracy among the four Middletons and Bingham, or any of them, including appellant, Calvin Middleton, to justify the submission of that question to the jury. It is true, as contended by appellant, that to establish a criminal conspiracy there must be shown by facts or circumstances a joint assent of the minds of the accused to commit the criminal act charged, but it is also a well established principle that a conspiracy may be shown by circumstances from which the jury may infer its existence and that when the circumstances are reasonably inducive of that inference it is for the jury to determine whether it did or did not exist. See Pharris v. Commonwealth, 198 Ky. 51, 248 S. W. 230; Gambrell v. Commonwealth, 130 Ky. 513, 113 S. W. 476; Pace v. Commonwealth, 170 Ky. 560, 186 S. W. 142; Morgan v. Commonwealth, 188 Ky. 458, 222 S. W. 940; Anderson v. Commonwealth, 196 Ky. 30, 244 S. W. 315. We do not hesitate to hold that the facts and circumstances proved by the Commonwealth upon the trial of this case were amply sufficient to authorize the inference that a conspiracy had been formed by the defendants to take the life of Denny Williams, and we hold that it was not error for the court to submit that question to the jury.

Appellant complains most vigorously of the action of the trial court in not submitting to the jury an instruction advising them that if the defendant and his co-defendants were summoned by the deputy sheriff Sexton to assist in arresting Denny Williams that they had the right to enter the train on the occasion in question armed for that purpose. The fault with that contention and the fact that deprives the defendants of the right to that instruction is that according to their own evidence the

shooting of Denny Williams was not done by them in attempting to arrest him but was begun by Calvin Middleton in self-defense and before he had notified or had an opportunity to notify Williams that he was seeking to put him under arrest. The jury knew that the defendants had the legal right to be where they were on this train regardless of whether they had been summoned to be there as members of a posse in charge of the deputy sheriff or merely as private citizens. According to defendants' version of the matter, the shooting began not in furtherance of the attempt to arrest Denny Williams but because Denny Williams put Calvin Middleton in danger of losing his life or suffering great bodily harm at the hands of Williams before he undertook to arrest him. We will say in this connection also that the brother and other close relatives of the man who had been killed were not proper persons to be summoned by the deputy sheriff to aid him in arresting Williams. The practice of summoning such persons as posse men cannot be condemned too strongly. No surer plan to bring about an additional homicide or possibly several of them could be devised than to arm the brothers and close relatives of one who has been killed and send them out to seek the slayer. A number of opinions of this court disclose that homicides have resulted from such practice. The number of such cases lead us to the opinion that the question should be the subject of legislative action.

Appellant contends that the court erred by giving instruction No. 6, by which the jury was told that if they should believe from the evidence beyond a reasonable doubt that Calvin Middleton was a party to a conspiracy with any one or more of the persons named in the previous instructions, which was formed for the purpose of taking the life of Denny Williams, and that in pursuance of such conspiracy and while it existed Calvin Middleton or any one or more of the conspirators went to the place where they knew or believed Williams would be for the purpose of killing him and did then and there wilfully kill him in execution of the conspiracy, or that Calvin Middleton or any one or more of the conspirators first commenced the difficulty by shooting or attempting to shoot Williams, then the jury could not acquit Middleton on the grounds of self-defense. That instruction might have been erroneous if, as contended by appellant, there was not sufficient evidence of the conspiracy in proof to

warrant the submission of that question to the jury. We have held contrary to appellant's contention, however, on that question. The instruction complained of qualifying appellant's right to be acquitted upon the ground of self-defense fully measures up to the rule on that question adopted and followed by this court in many cases. The most recent case on the question is Newsome v. Commonwealth, 204 Ky. 179. The instruction complained of is in almost the exact language of an instruction prepared by this court in the case of Gambrell v. Commonwealth, 130 Ky. 513. We hold that the instruction complained of was not erroneous.

Appellant insists that the following instruction given upon the trial of his case was erroneous:

> "You are to take and receive all the evidence which the court permitted you to hear about the alleged killing of Hiram Middleton by Denny Williams for the purpose only, and in so far only, as it may in your judgment tend to show motive for the acts and conduct of the parties to the difficulty in which Denny Williams was killed, if in your judgment it does show or tend to show motive. And the word 'motive' as used in these instructions means inducement, reason, cause or incentive to do the acts and things charged in the indictment herein, if any of them were done."

The instruction is an unusual one in cases of this kind, and yet it sets forth exactly the law relating to the subject embodied in it. Evidence of the fact that Denny Williams, the deceased, had on the afternoon that he was killed previously killed Hiram Middleton, a brother of defendant, Calvin Middleton, was competent to go to the jury only for the purpose of showing the motive Calvin Middleton had for killing Denny Williams. The court so instructed the jury in the instruction above complained of. Ordinarily such testimony is admitted and the instruction is given the jury orally by the court that it is competent for the purpose above indicated only. The court in this instance so instructed the jury in writing. We hold that this instruction was not prejudicially erroneous.

Appellant insists that the judgment herein should be reversed because of improper conduct of the attorney for the Commonwealth in the closing argument. It ap-

pears from the bill of exceptions that in the closing argument, over appellant's objection, overruled by the court, with exception by appellant, the attorney for the Commonwealth used the following language:

> "I hope, gentlemen of the jury, there isn't any member of this jury so corrupt as that he would be in favor of acquitting the defendant; I make this statement, advisedly; I hope there is not any member of this jury so corrupt as to be in favor of an acquittal of defendant."

These remarks were improper and the court should have sustained appellant's objection to same. We, however, are not authorized to reverse a judgment unless by the error complained of appellant's substantial rights have been prejudiced. The statement quoted, it seems to us, is calculated to prejudice the Commonwealth's case rather than that of defendant. The veiled insinuation that the jury might be corrupt, as we view the matter, would have a tendency to prejudice the jury against the Commonwealth rather than against the defendant. Hence, we hold that the error complained of was not prejudicial to defendant's substantial rights and that it does not authorize the reversal of the judgment.

The other questions raised by appellant have been covered by our conclusions hereinbefore set forth; and, since our careful consideration of the record of this case has convinced us that upon his trial none of appellant's substantial rights were prejudiced, the judgment is affirmed.