## Ball v. Commonwealth.

(Decided June 1, 1928.)

## Appeal from McCreary Circuit Court.

1. Criminal Law.—Presumption of innocence attends a defendant charged with conspiracy, and prosecution must prove the existence of conspiracy, and defendant's connection therewith.

2. Conspiracy.—Though burden of proof rests on commonwealth to establish conspiracy, direct evidence is not indispensable, and on proof of unexplained facts from which existence of conspiracy may be reasonably inferred, defendant is required to come forward with evidence to establish his innocence.

3. Homicide.—In prosecution for murder in which the court failed to give straight murder instruction, evidence held sufficient to sustain conviction of defendant for conspiracy to commit murder.

4. Homicide.—Where evidence sufficiently established existence of conspiracy to commit murder by reason of defendant's presence when the crime was discussed and his knowledge when it was to be perpetrated, testimony as to threats made by defendant's fellow conspirators held competent as against defendant.

5. Criminal Law.—Instructions given by court, whether good or bad, are the entire law of the case as far as the jury is concerned, and jury is required and presumed to obey them.

6 Homicide.—In prosecution for murder, where there was no direct murder instruction given, and evidence sufficiently established conspiracy to commit murder, jury's verdict of guilty was construed as conviction for conspiracy to murder.

JAMES DENTON and JOHNSON & GILREATH for appellant.

J. W. CAMMACK, Attorney General, and S. H. BROWN, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER—Affirming.

The appellant, Ball, was convicted of murder and his punishment fixed at life imprisonment. This homicide was a cruel, cowardly, pitiless, and pusillanimous assassination, for which Tom Gilreath, Jim Ball, Ed Smith, Willie Gilreath, George Hogue, and Luther Richmond were indicted. Tom Gilreath is the father of Willie Gilreath and is the father-in-law of Ed Smith. Jim Ball's wife is a cousin of Tom Gilreath, and Willie Gilreath married a sister of Jim Ball. The relationship of George Hogue and Luther Richmond to the other defendants did not appear in the record, further than this, that there

was evidence that they were associated with this crowd in the manufacture of intoxicating liquor. Tom Gilreath was a middle-aged man; his son Willie was 20 years of age; his son-in-law, Ed Smith, was 25; and Jim Ball was 34. The ages of the other defendants do not appear. Tom Gilreath appears to have been the organizing genius and director of operations.

Pete Kidd and his family and Ball and his family lived in McCreary county, Ky., and were neighbors. Their houses were in sight of each other, and about 300 or 400 yards apart. The families did not get along, and they had had trouble with each other. Mrs. Kidd says she and Odrie Kidd saw Willie Gilreath, Luther Richmond, George Hogue, Ed Smith, Lem Perkins, and Walter Payne engaged in the operation of a still. After that they were summoned before the grand jury and testified to what they had seen. It seems that Ball and those associated with him determined to rid themselves of the Kidd family. There was evidence that they sought to accomplish this by dynamiting the house in which the Kidds lived, on March 28, about 12 o'clock at night, but, when they went there for that purpose, they were frightened away by the dogs, and so contented themselves by shooting into the house, whereupon Mrs. Kidd returned the fire, and the party broke up. She testified that Jim Ball, Roosevelt Stephens, and Leslie Gilreath were in this party. Later Willie Gilreath claimed his house was robbed. A search warrant was obtained, and the house and premises occupied by the Kidds were searched. Nothing was found in the house, but on the premises some sacks, containing articles belonging to Willie Gilreath, were found. There was evidence that would indicate these things had been taken from the home of Willie Gilreath by Tom Gilreath, and planted where they were found. The court properly refused to allow the witness to go further into this supposed burglary, so we do not know what came of it; but, anyway, the Kidds were not run out of the community by it, and, as the time for court approached, the necessity of getting the Kidds out of the way became more urgent. It is the theory of the commonwealth that these men conspired and agreed together to kill the Kidd family.

On August 31, 1926, Mrs. Kidd and her son Odrie had gone to Pine Knott to do some washing. The younger Kidd boy, Freddie, spent the day at his grandfather's and in the evening of that day, about dusk, the

family met together at the grandfather's and started home. They were walking single file. Freddie was in front, Mrs. Kidd next, then Odrie, and the father, Pete Kidd, was bringing up the rear. As they passed a clump of bushes on the roadside, they were fired upon. Mrs. Kidd says there were ten shots fired. Odrie Kidd was instantly killed; Pete Kidd ran a short distance, fell, and died in a few minutes. The mother and Freddie do not appear to have been wounded. Freddie says that the two men that were behind the bushes were Jim Ball and Willie Gilreath. His mother says the same, and says that Jim Ball was doing the shooting. This shooting occurred a short distance from the home of Jim Kidd, the father of Pete, and grandfather of the boys, and when he heard the shooting, he seized his gun and hurried to the scene, and the evidence would indicate that it was his arrival and the exhaustion of their ammunition that caused the men who were doing this shooting to depart.

The court gave to the jury an instruction on conspiracy, in which the jury was told that, if they believed beyond a reasonable doubt the defendants in the indictment, naming them, had conspired and agreed to kill Odrie Kidd and Pete Kidd, and that pursuant thereto they were killed, they should find Ball guilty of murder. The court then gave an instruction devoted to definitions, an instruction upon the evidence of an accomplice, and an instruction upon reasonable doubt. For some unaccountable reason the court did not give a straight murder instruction, which should have been done, and the omission to do this has added to our labors, and to the length of this opinion, for, in the absence of a straight murder instruction, it became necessary, in order to convict Ball, that the commonwealth should establish that there was a conspiracy to commit this murder, to which conspiracy Ball was a party, and the principal part of the brief for the appellant is directed to the question of the sufficiency of the evidence to establish that a conspiracy existed, and that Ball was a party to it, for, if he were not a party to the conspiracy, it is insisted he could not be convicted under these instructions, even though the jury believed that he did the killing, a question we need not and do not decide, and, if he were not a party to this conspiracy, then, of course, the evidence of the declarations and threats made by his alleged coconspirators was not competent evidence against Ball.

So we will review the evidence on that subject. The commonwealth showed by Jim Gilreath that in June before the killing, in the presence of Jim Gilreath, Jim Ball, and Leslie Gilreath, the killing of Chris King and his wife and the disposition of Pete Kidd's family was discussed by Tom Gilreath at the home of Jim Gilreath; and Tom Gilreath said he wanted to get rid of Chris King for having indicted him in the federal court; that he wanted them killed; and Jim Gilreath said that he wanted us to kill them, and he would furnish the gun and the buckshot. He was then talking about Chris King and wife, and some one suggested that King's wife always went with him, and Tom Gilreath said, "Just take her, too," and after the killing to take the gun to a hole of water and throw it in; "damn the gun, let it go." Pete Kidd's name was mentioned in that conversation. Tom Gilreath was told that he could not get by with anything like that, as Pete Kidd's folks had indicted him, and he said he would take care of them in plenty of time. Tom Gilreath said:

"You see how George Wiley's barn went. You have to take care of things step by step as you get to them."

Tom wanted Jim Gilreath, his son Leslie, and Ball to do this killing, and he said if these parties went to court they would stick him; that they would send him to Atlanta, as it was his second offense; and he said if Chris got down to Somerset he was liable to indict them all. This witness, who was the father-in-law of Ball, testified that Ball said he would not do anything like that, and that Ball asked him to tell Chris King about the danger he was in. Ball said he did not tell the Kidds because he was afraid of Tom Gilreath.

Ball himself testified. He admitted that he was present on this occasion when Tom Gilreath suggested that he (Ball), Jim Gilreath, and Leslie Gilreath should kill Chris King and his wife. He admitted he said nothing to King, but asked his father-in-law to tell King, and he admitted he said nothing to Pete Kidd or his family. Ball knew that Pete Kidd and his family had had him indicted, and he knew that Tom Gilreath was trying to arrange to have them killed. He admitted that Tom Gilreath discussed this with him on three occasions. First, along in April, the next discussion of it was in June at the home of Jim Gilreath, and the next discussion of it

was the morning of the 30th of August, the day before the homicide. On one occasion, when Ball and Tom Gilreath discussed this killing, Tom asked him who would be a good man to do it, and Ball suggested George Hogue, to which Tom Gilreath replied: "That damn fool would do anything." Ball testified that in one of these discussions about the killing of Pete Kidd and his family he said:

> "Tom, if anything like that was to happen, they would lay it on me. My family and Pete's family are at outs."

Then it was that he (Ball) suggested that George Hogue would be a suitable man. Ball said that this suggestion was made at the time of their first conversation, which was in April. Ball also offered to testify that he told Tom Gilreath if anything came off he wanted to know it, so that he could get out of the way, as the Kidds would lay it on him. He further says that on Monday, August 30, Tom Gilreath told him to get in the clear on Tuesday night; that something was going to happen; so about 3 o'clock on Tuesday afternoon Ball began to get in the clear. The first place he went to was Elihu King's. He was there a short time, and talked to his wife. He then proceeded on his way to Stearns, Ky., and on the way spoke to Josh King. He was next at Leroy Lovitt's where he saw Leroy and George Crabtree and his wife, and Mandy Lovitt. The next place was Joel Lovitt's and he saw Joel and his wife. He then got to John Green's about 6:15 and he saw Miss Lorena Green. After he left that place, he saw John's two boys. He says he got to his father's place about 6:30 and directly he got there, that his sister, Mrs. Goldie Holt, holloaed and asked him what time it was, and he told her it was 20 minutes of 7. He says he spent the night at his father's, and he has witnesses that he did. The exact distance of his father's house from the scene of the killing is not given, but Ball testified that he had walked it in 75 minutes. He admitted that he knew this killing would take place, and that he made this trip in order that he might not be in the community when the killing took place, so it would not be laid on him.

Thus we have his own admission that on three occasions he discussed with Tom Gilreath the killing of the Kidd family; that he suggested his codefendant George

Hogue as a suitable man; that the disposition of the gun that was to be used was discussed; that the day before it occurred, he was at Tom Gilreath's and received information that it was to come off the next night; and that he proceeded to get in the clear. It is his contention that he never became a party to any conspiracy to kill the Kidds; that he took no part in it, and was at his father's, more than three miles away, a distance which it would take him 75 minutes to walk. He did not say how long it would take to make this trip on a horse or in an automobile. We have positive evidence from Mrs. Kidd and Freddie Kidd that he was there at the time of the killing. Mrs. Kidd said he did the killing and Willie Gilreath, one of his codefendants, said Ball did the killing. He further said they had been discussing this for three or four months, but the commonwealth showed the particular time was agreed upon about 1 o'clock on the afternoon of the killing. This killing was done with a Winchester automatic shotgun, which was the property of Tom Gilreath. The killing was done with shells loaded with buckshot. It was in evidence that Willie Gilreath had removed the small shot from these shells and substituted the buckshot. That this was done was shown by the evidence of Claude Ball, son of Jim Ball. This boy further testified that he heard Tom Gilreath and his father, Jim Ball, talking about Pete Kidd's family, and that Tom Gilreath said: ·

> "He was going to get *shed* of them when everything got still; he was going to blow them all to hell, and was not going to leave *narry* one to tell the tale."

That was about a week before the killing. There is no evidence to show that Jim Ball said anything on that occasion further than that he and Tom Gilreath were talking.

The presumption of innocence attends a defendant charged with conspiracy. The prosecution must prove the existence of the conspiracy, and defendant's connection with it. Parties agreeing together to engage in a matter of this kind do not usually blow a horn or beat a drum to call attention to what they are doing. These things are usually hatched and carried out in secret. In Middleton v. Commonwealth, 204 Ky. 460, 264 S. W. 1041,

we said this, and cited numerous authorities to support it:

"To establish a criminal conspiracy there must be shown by facts or circumstances a joint assent of the minds of the accused to commit the criminal act charged, but it is also a well-established principle that a conspiracy may be shown by circumstances from which the jury may infer its existence and that when the circumstances are reasonably inducive of that inference it is for the jury to determine whether it did or did not exist."

In Davis v. Commonwealth, 13 Ky. Op. 329, we said:

"Upon a charge of conspiracy in the commission of crime the testimony must necessarily take a wide range, else it could rarely be shown, since positive evidence of its existence is rarely attainable; and yet courts for the proper protection of life and liberty should carefully guard against the abuse of this rule. It can usually only be shown by a slight circumstance, (slight circumstances) which, woven together, make a complete whole.

"Therefore, in such a case, while there must be some connection between the fact to be proven and the circumstances offered to support it, yet any fact which shows the relation of the parties charged with the crime or which is necessary to introduce or explain another fact in issue, or which afforded an opportunity for any transaction which is properly in issue may be proven. Any fact may be shown which tends to show the relation of the conspiring parties and that facilities or motives existed for the commission of the crime. Even evidence tending to prove a distinct offense may be admissible if so connected as to constitute a part of one entire conspiracy or if it explains or shows motives or facilities for the commission of the one in question."

In West's Kentucky Digest, under title "Conspiracy," 47, a number of cases will be found wherein we have said that a conspiracy may be established by circumstantial evidence. The secrecy that attends such matters usually precludes the commonwealth from pro-

ducing direct testimony of the existence of a conspiracy and, while it is true that the burden rests on the commonwealth to establish the conspiracy, still, when the commonwealth has established facts from which, no explanation being offered, the existence of a conspiracy may be reasonably inferred, it then devolves on defendant to come forward with evidence of his innocence or take the consequences. See Reg. v. Deasy, 15 Cox C. C. 334; State v. Bingham, 42 W. Va. 234, 24 S. E. 883. Direct evidence is not indispensable. See 12 C. J. 633.

Here, however, we have the direct evidence of Jim Gilreath that this killing was discussed in the presence of Ball. We have the direct evidence of Ball's son that it was discussed in Ball's presence. We have the direct evidence of Willie Gilreath that Ball knew all about it, was in it all, and planned the ambuscade for the killing. We have Ball's own admission that they had been discussing this thing from April until the latter part of August; his own admission that he knew the day before that something was going to happen, and that he was endeavoring to get in the clear. We have so much that the jury could not have found otherwise than as it did, that a conspiracy existed to do this killing, and that it was done pursuant thereto. Hence the evidence of threats made by his fellow conspirators was competent against Ball, and there was ample evidence to sustain the court's rulings on the evidence, the instruction basing Ball's guilt upon the establishment of this conspiracy, and the jury's verdict.

The instructions given, whether good or bad, are to the jury the whole law of the case. See Farmers' Bank & Trust Co. v. Harding's Ex'r, 209 Ky. 3, 272 S. W. 3; Lynch v. Snead Architectural Iron Works, 132 Ky. 241, 116 S. W. 693, 21 L. R. A. (N. S.) 852. As the jury must obey the instructions given, and the presumption of regularity would require us to hold that they did, nothing to the contrary appearing, it follows that, as there was no direct murder instruction given, the verdict of this jury is a finding that there was a conspiracy to kill these Kidds, and that Ball was a party to it.

The judgment is affirmed.