## Morgan, et al. v. Commonwealth.

(Decided June 11, 1920.)

### Appeal from Laurel Circuit Court.

1. Criminal Law—Independent Offense—Evidence.—Testimony of an independent offense or the details thereof are not ordinarily admissible in a criminal trial upon a wholly distinct charge, but such independent offense may be shown for the purpose of establishing identity, guilty knowledge, malice, particularly criminal intent, or where it was a part of a plan or system of criminal action on the part of the defendant, or where it is so interwoven or connected with the one being tried as to be insparable. Nor is it a violation of the rule disallowing such testimony where the independent offense consists of one of several stages of a continuous act constituting the offense being tried, as in case of a conspiracy to commit the principal crime.

2. Criminal Law—Conspiracy—Weight and Sufficiency of Evidence. —A conspiracy being difficult of proof is necessarily established by the testimony of a number of circumstances constituting links in the formation of the general purpose of the conspirators all

of which when considered together are sufficient to establish the conspiracy.

3. Criminal Law—Conspiracy—Evidence.—Upon the trial of defendants under an indictment charging them with a conspiracy to commit murder, and committing it in pursuance thereof, it was competent to admit testimony of their words, acts and conduct to and with deceased, a deputy sheriff, or one of his posse, on the night before the killing. all of which indicated malice and anger on the part of defendants, since such testimony was relevant on the charge of conspiracy.

4. Criminal Law—Self-Defense Instructions.—It was not error to qualify the self-defense instruction so as to deprive the defendants of that right if the fight in which the killing occurred was by mutual combat or was brought on by defendants themselves first assaulting and shooting at the deceased and his crowd, if the testimony of the Commonwealth was sufficient to establish such facts.

5. Criminal Law—New Trial—Witnesses—Impeachment.—A new trial will not be granted upon the testimony of one of the jurors as to what occured in the jury room, except upon the ground that the verdict was arrived at by lot; but were the rule otherwise the impeaching testimony must be given by some member of the jury and not appear through the affidavit of another with whom the juror had talked.

HAZELWOOD & JOHNSON for appellants.

CHARLES I. DAWSON, Attorney General, THOMAS B. McGREGOR, Assistant Attorney General and W. P. HUGHES for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The appellants, Leonard Morgan, John Forman, Felix Forman, Steve Forman and William Poe were convicted in the Laurel circuit court of the crime of voluntary manslaughter on their trial under an indictment charging them with murdering James Baker. The verdict fixed the punishment of Leonard Morgan, John Forman and William Poe at confinement in the penitentiary for twenty-one years; that of Felix Forman five years, and of Steve Forman two years. Their motions for a new trial having been overruled, they each appeal.

The killing occurred in Clay county on the night of February 12, 1919, near the hour of eight o'clock. The first count in the indictment charged the defendants with jointly committing the murder, while the second count alleged a conspiracy entered into between the defendants whereby they agreed, conspired, and banded themselves together to commit the murder, which they afterward did in pursuance thereof.

But three grounds are urged as alleged errors to secure a reversal of the judgment, they being (1) the admission of incompetent testimony introduced by the Commonwealth; (2) erroneous qualification of the instruction on self-defense, and (3) misconduct of the jury while in the room considering their verdict.

The record in the case is a large one, and it would unnecessarily encumber this opinion and serve no useful purpose to make a detailed statement of all of the facts. We will therefore give only a brief synopsis of the more prominent ones which we deem sufficient for the determination of the questions raised.

The two factions engaged in the fight in which the killing of James Baker occurred may be said to have been headed the one by the deceased, who was at the time a deputy sheriff, and the other by the defendant William Poe. The deceased and his crowd, consisting of seven or eight persons, including his brother, Hugh Baker, were stationed at a school house for the purpose of arresting some members of the Poe crowd, which included the defendants, under a warrant which Hugh Baker had procured from a justice of the peace about four o'clock that afternoon. The warrant had been issued at the instance of Hugh Baker because of depredations committed by Poe and his crowd the night before at the home of Vernon Hensley, where Hugh Baker was spending the night. It is the introduction of the details of what occurred at Hensley's house on the night before the killing that forms the principal basis of ground (1) urged for a reversal.

The defendants, Leonard Morgan, Felix Forman, William Poe, Steve Forman and Jim Hatchett Baker, Merida Smith, Tine Williams and Bud Tegarden, composed the Poe crowd who went to the home of Vernon Hensley on the night of the 11th, the defendant, John Forman, was not present. All of them knew that Hugh Baker was spending the night there, and they claimed that they went there to see him in response to an invitation sent by him to William Poe for the purpose of talking about a lost moonshine still worm. All of the crowd armed themselves with shot guns, pistols and rifles of various calibers and powers for the visit, in response to this alleged invitation, and they explain their being thus armed by saying that they intended on this trip to catch some chickens which Leonard Morgan had sold to Jim Hatchett Baker, but since they neither carried nor could

find a lantern, they abandoned that idea after they left Hensley's house.

As to what occurred there the witnesses for the Commonwealth, some six or seven in number, practically agree, and since Vernon Hensley is a disinterested witness, we have concluded to incorporate his statement as to what happened. He says that awhile after supper someone hallooed at the gate; that he went to the door and asked what they wanted, when William Poe inquired if Hugh Baker was there, and being informed that he was, the following occurred, according to the witness:

"Q. He told me to tell Hugh to come out there, he wanted to see him, and I went back into the house and told Hugh that Wm. Poe was out there, he wanted to see him and he said to tell him to come in the house, and I stepped back and told William that Hugh said to come in—I invited him in, and he spoke to Hugh, and he says, 'Hugh, old brother, come out here, I want to talk to you a minute.' Hugh got up and come out. Orville Hensley and Charley Collins come pretty close to him, and I was out in the yard. We all walked up to the front gate, and Hugh was a little in front. He walked up and put his hands up on the pailings, like this (indicating to the jury). William reached out like he was shaking hands with him, with his left hand, Poe did, and Hugh asked him what he had in his hand, and he says, 'I have got a forty-five,' he says, 'I understand you are going to report me for moonshining and I have come up here to tell you one thing, there is no God damned man can do that and live.' He says, 'Who told you that?' and Hughie says, 'Jim Hatchett Baker told me,' and Hughie says, 'I never said it,' or something like that, and about that time Jim Hatchett Baker come around from behind the little mill house, on the left of the gate, that was on the right, and I was standing about the road. A part of this mill house was boxed up, and he come around with a pistol in his hand and he says 'Hugh Baker, you are a God-damned black-hearted son-of-a bitch-of-a-liar,' and he throwed his pistol on Hughie. I heard a little noise back there, on the outside, and I thought I would go around the mill—lower side of the mill house—something struck me that there might be somebody else there, and as I was crossing the fence at the far end of the mill house from the yard, Jim Hatchett Baker says, 'Vernon Hensley, by God, you get back into the house,'

I says, 'I am at home,' and he says, 'You God damned son of a bitch, get back there or I will shoot your brains out if you don't. I made another step, and I heard something like guns clicking, and I looked up and seen Tine Williams, Steve Forman, Felix Forman and Bud Tegarden had guns on me, and Merida Smith was standing there with a gun, and Leonard Morgan run back with a pistol in his hand, kindly down by his side, and I say, 'What are you doing there?' None of them would speak and I started to go back in the yard, and as I crossed the fence, Leonard Morgan following me to the engine, and left him standing between myself and Hugh Baker, and after I walked back to where I was—Jim Baker was cursing and calling me all kinds of bad names, and cursing me, and they was cursing Hugh and calling him all kinds of bad names, and Leonard Morgan come on down around directly, and says, 'Boys, we had just as well go now,' and they started on up the road.''

It is shown that several others, including Mrs. Hensley, were present and heard and testified to that conversation, and the latter importuned William Poe and his crowd with tears not to shoot or kill any one, but to go away and let them alone. William Poe's version of what occurred on that occasion is that he called for Hugh Baker, who came out, and he discovering that Poe had a pistol, asked the latter to lay it down, which he did, whereupon the parties shook hands. Poe then asked Baker, "Who told you that I had anything to do with your still worm in any way?" when the latter replied, "Jim Hatchett Baker," and thereupon Jim Hatchett performed his part as testified to by Hensley. Witness then says that he and Hugh Baker felicitated each other over the amicable understanding reached and extended mutual invitations for visits between their respective families. The Poe crowd, on leaving the Hensley house, went to the residence of a brother of William Poe, and after a considerable time the members scattered to different places to spend the night. According to the testimoney of Poe, Williams and Smith, they and Tegarden were traveling along Ayler Lick branch the next evening on their return from inspecting a rented place which they were going to cultivate that year, when about six thirty p. m. Hugh Baker and his brother Bob shot at them from a mountain side, wounding Tegarden, from which wound he died a few days thereafter; that immediately after this shooting William Poe went to the home

of one of his brothers and from thence to the home of the defendant, John Forman, and began gathering a crowd for the purpose of looking after and taking care of Tegarden, Smith and Williams, all of whom, he thought, as he testified, had been wounded. He collected his crowd and they were on their way to the scene of the alleged shooting when they arrived at the school house where the fight occurred in which Jim Baker was killed. Poe seems to have had but little trouble in assembling his crowd on that occasion, and each of them, when found by him, was either armed or immediately armed himself. Hugh and Bob Baker deny that any shooting took place on Ayler Lick branch, or at any other place except during the fight at the school house, the two occasions being about one or one and one-half hours apart, according to the testimony of the defendants.

It is the theory of the Commonwealth that the wounding of Tegarden occurred at the school house, and there are a number of circumstances indicating that such was the fact. Upon this issue there was, as is usual in such cases, a contrariety of testimony, as well as conflicting circumstances. No one of the Poe crowd was wounded in the school house fight, unless it was Tegarden, and it is indisputably established that blood was found in the path or road leading from the school house to William Poe's house, where Tegarden lived, and it is likewise testified to that soon after the school house shooting there were lamentations of both men and women in the direction of William Poe's house.

On the other hand, defendants introduced testimony corroborating their story about the shooting on Ayler Lick branch. So, whether there were two combats on that evening or only one at the school house was a question for the determination of the jury.

The Commonwealth's witnesses, consisting of those who had been summoned by the deceased to help him execute the warrant upon some of the defendants, testified that when the Poe crowd approached the school house the deceased stood on the steps and said, "Hold on, boys, don't do that, I want to talk to you," when immediately he and all his posse were fired upon, and he received the wounds from which he died. He made a dying statement to this effect, in which he was corroborated by the testimony of all of the others of his crowd who were present. The defendants say that as they got about in

front of the school house they were fired upon without
any words being uttered, which firing they returned.
The whole front of the school house was filled with shot
and bullets and evidently a fierce battle was fought. It
is the theory of defendants that there was never any
warrant obtained by Hugh Baker, but that on the con-
trary he, his brothers and others whom they had gather-
ed together, had banded themselves together for the pur-
pose of assaulting and perhaps killing the members of
the Poe crowd. There was no objection to the complained
of testimony concerning the details of what cocurred at
the home of Vernon Hensley at the time it was given,
but afterwards the defendant, John Forman, moved the
court to exclude it from the consideration of the jury,
presumably upon the ground that he was not present at
the time. So that whatever might be said as to the re-
levancy of that testimony, none of the defendants is in
position to complain of its introduction, unless it be the
defendant John Forman.

The chief case relied on by defendants in support of
their objection to this testimony is that of Martin v.
Commonwealth, 93 Ky. 189. In that case the deceased
had caused the defendant to be indicted for robbery.
The court not only permitted the introduction of the
indictment, upon which appeared the name of the de-
ceased as a witness, but allowed the introduction of
details of the alleged robbery. Such details manifest-
ly had no connection at all with the crime for which de-
fendant was being tried. When the robbery was over,
if it occurred at all, defendant's full purpose in com-
mitting it was accomplished. The only relevancy of the
indictment even, was to show motive for killing the de-
ceased, in order to dispose of him as a witness on the
robbery indictment.

It is the general rule that neither testimony of the
commission of another independent crime, nor testi-
mony of its details, may be given in evidence upon the
trial of another charge, but there are exceptions to this
rule, as when it is necessary to establish by the inde-
pendent crime the identity of the accused, or where it
is necessary to show guilty knowledge on his part, or
where it shows the particular criminal intent of the de-
fendant, or motive or malice for the commission of the
crime for which he is being tried, or where the inde-
pendent crime is so interwoven and connected with the

one on trial as that they can not be separated or to prove a charged conspiracy. These general rules will be found stated in the case of Musick v. Commonwealth, 186 Ky. 51; Romes v. Commonwealth, 164 Ky. 333; Graham v. Commonwealth, 174 Ky. 645; Jenkins v. Commonwealth, 167 Ky. 544; Clary v. Commonwealth, 163 Ky. 48; Thomas v. Commonwealth, 185 Ky. 226, and Shotwell v. Commonwealth, 23 Ky. Law R. 1649.

The text in 10 R. C. L. 940, in stating one of the exceptions to the general rule, says: "It (the rule) does not apply where the subject matter under investigation is of such a nature that it may consist of several stages or continuous acts, all constituting one transgression." Manifestly it would not be a violation of the rule where the particular acts constituting the alleged independent crime were relevant in establishing a conspiracy where such a charge is made in the indictment.

This court, in the case of Gambrell v. Commonwealth, 130 Ky. 513, said that "A conspiracy is almost necessarily established by the welding into one chain of a number of links each in itself inconclusive and insufficient to prove the conspiracy, but, when connected and examined as a whole, sufficient to show it," and furthermore said in substance that all acts and declarations of either of the conspirators before accomplishing the object of the conspiracy and after it was formed, was, in law, the act of all of them.

If the purpose of the details of what occurred at the home of Hensley was to establish motive, alone, there might be room for the contention that the court should have admonished the jury as to its purpose, but such was by no means the entire purpose of that testimony. It strongly tended toward the establishment of the alleged conspiracy to kill Hugh Baker because of evident enmity existing between him and members of the Poe crowd, which killing would perhaps have occurred that night had it not been for the interference of Mrs. Hensley. No one can read this record and conclude that the mission of Poe and his crowd that night was wholly an innocent one.

An objection to similar testimony was urged in the Gambrell case, but this court, in overruling it, said:

"The declarations and acts of either of the conspirators, in pursuance of the conspiracy, after it was formed and before the end, was in legal contemplation

the act of all of them. Each was responsible for what the others did in the prosecution of the design for which they combined. It was competent to show the cause of the ill feeling, the threats, the hostile declarations, the purchase of the cartridges, the whispered conversation at the school house, the fact that they left it in a body when John Gambrell was seen approaching and every circumstance and incident that tended to throw light upon their acts in furtherance of the common design. Powers v. Commonwealth, 61 S. W. 735, 22 Ky. Law Rep. 1807, 53 L. R. A. 245; Commonwealth v. Hargis, 99 S. W. 348, 30 Ky. Law Rep. 510.''

Under the facts disclosed by this record, we are quite sure that the court did not err in admitting the complained of testimony, were all of the defendants in condition to insist upon it.

From the authorities referred to it will also appear that the testimony was not prejudicial to the rights of the objecting defendant, John Forman, although he was not present, since it went to establish a conspiracy through the utterances of co-conspirators before the accomplishment of their common purpose. For similar reasons the testimony given as to threats against Hugh Baker made by William Poe a few days before the killing was also relevant.

The foundation for ground (2) urged for a reversal is a qualification given to instruction No. 5 on behalf of each defendant, it being the self-defense instruction, and which qualification says; ''Unless you shall further believe from the evidence, beyond a reasonable doubt, that the combat and fight was voluntarily engaged in by both defendant, William Poe, and those acting with him, if any, and by the deceased, James Baker, and those acting with him, if any, with intention on the part of each to kill the other, or to do him great bodily harm, or that the defendant Wm. Poe, and those acting with him, if any there was, when they were in no danger, real or to him or them apparent, of death or great bodily harm at the hands of the deceased, or those with him, or either of them, began the difficulty by shooting at the deceased, or those with him, and thereby so made the danger to himself or those acting with him, if any, excusable on the part of the deceased, and those with him, in their necessary or apparently necessary self-defense, then and in either of these events, the defendant, Poe, should not be acquitted on the ground of self-defense or

apparent necessity or the defense of another, or apparent necessity therefor.''

In support of this ground it is insisted (a) that there was no evidence that the fight at the school house was voluntarily engaged in by the two opposing forces, and (b) that the testimony conclusively showed that defendants did not begin that difficulty, but that on the contrary they were upon the merciful mission of clearing up the battlefield on Ayler Lick branch. If the premises assumed by defendants' counsel were true, the correctness of their criticism would necessarily follow. We have before said that they insist that the Bakers had no warrant for their arrest. Evidently there was bad blood existing between the two factions growing out of their charges and counter-charges with reference to illicit distilling, and the testimony is amply sufficient, leaving out entirely the consideration of any warrant for the arrest of the defendants, to authorize the conclusion that each party was on the lookout for the other, and that they intended to engage in mutual combat upon meeting. Furthermore, the ''merciful mission'' theory is not only dispelled by the testimony of the Commonwealth's witnesses, but by a number of convincing circumstances appearing in the record. At any rate the qualification of the self-defense instruction complained of presented the theory of the Commonwealth, and which theory its testimony tended to establish, and it was proper that the court should submit it to the jury.

In passing, we might say that it is seldom we find more appropriate instructions in a criminal case than those found in this record. We therefore dismiss this ground as being without merit.

Ground (3) urged by counsel for a reversal is based upon an affidavit of one of them that a juror who sat in the case had stated to him after the jury were discharged that another juror, while considering the case, stated that one could not see the school house where the fight occurred from the residence of William Poe, thereby contradicting some of defendants' witnesses who testified to having seen the fight from William Poe's house.

Long before the enactment of section 272 of the Criminal Code, this court, in the case of Johnson v. Davenport, 3 J. J. Marshall, 393, with reference to receiving testimony of jurors for the purpose of impeach-

ing their verdict, said: "The dangerous tendency of receiving testimony of jurors for such a purpose is too obvious to require comment. It would open a door so wide, and present temptations so strong for fraud, corruption and perjury as greatly to impair the value of, if not eventually to destroy, this inestimable form of trial by jury." Those statements were quoted with approval in the case of Commonwealth v. Skeggs, 3 Bush 19. See also the case of Caldwell v. Spears, 186 Ky. 64.

The section of the Criminal Code referred to forbids the examination of a juror to establish ground for a new trial, except to show that the verdict was made by lot. Under these authorities, the affidavit of the juror containing the facts alleged to have been stated to counsel would not be sufficient to authorize a new trial, and *a fortiori* is it insufficient when appearing second hand and in the form of hearsay testimony through the affidavit of counsel.

From a careful reading of the entire record, we are driven to the conclusion that the defendants had a fair and impartial trial, and that none of their substantial rights were prejudiced.

Wherefore, the judgment is affirmed.