## Salyers v. Commonwealth.

(Decided April 19, 1929.)

LEEBERN ALLEN, F. T. ALLEN and R. A. DUNN for appellant.

J. W. CAMMACK, Attorney General, and SAMUEL B. KIRBY, JR., Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

At his trial under an indictment in the Breathitt circuit court charging him with murdering Jessie Begley, the appellant, Tom Salyers, Jr., was convicted of voluntary manslaughter, and punished by confinement in the penitentiary for a period of nine years. On this appeal by him therefrom his counsel argue that the judgment is erroneous, and should be reversed, upon the grounds that: (1) The verdict is flagrantly against the evidence; (2) incompetent evidence introduced by the commonwealth over defendant's objections and exceptions; (3) improper instructions; and (4) misconduct of the jury during its deliberations of the case, each of which will be disposed of in the order named.

■ The killing occurred in the yard surrounding the residence of Carlo Salyers, an uncle of defendant, in Breathitt county, at about 11:30 p. m. on July 5, 1927. Defendant lived with his father a distance of some twelve miles from the residence of his uncle where the homicide occurred, and on that evening he left his father's home to visit, as he said, his sick sister, a Mrs. Howard, who lived about a half mile beyond Carlo Salyers. When arriving at the latter's residence, defendant claims that he was informed that his uncle was sick, and that his informant, who was some member of the family, insisted that he stop and see his sick uncle, and that he was finally persuaded to do so, although he was in a hurry to reach the residence of his sick sister and to return to his home before the then shining moon went down at about 11 o'clock, because after then it would be difficult to travel the mountain road. He arrived at his uncle's at about 8:30 p. m., and remained for about three hours, when the homicide occurred, and he then left without going to the home of his sick sister, but went to that of a neighbor, George Haddix, whom he informed of the killing, and he later returned to the scene where deceased was still lying in the yard upon the spot where he had fallen when shot. Upon that arrival by him he was met at the gate by Mrs. Carlo Salyers, who requested him to deliver to her his pistol, which he did, and he then went to, and took a seat upon, the porch of the residence; whereupon Mrs. Carlo Salyers said to him; "Go up and speak to him (deceased, who was still alive), and help give him water, I am not stout enough." While giving the deceased the water, defendant testified that the latter asked him if he was the man who shot him, to which defendant answered in the affirmative, and also said: "I am sorry this happened, but I do not think you are hurt bad, hope you are not," to which, according to defendant, deceased replied: "I think I am killed," and defendant then said: "I hope not." Defendant then testified that "he (deceased) laid there and talked with us all," but he stated that he did not remember anything else that deceased said, although some of defendant's witnesses testified that upon that occasion defendant asked deceased: "Didn't you make me do this," to which the latter replied, "Yes, I acknowledge I did."

The evidence shows without contradiction that deceased arrived at the residence of Carlo Salyers about 6:30 p. m., on that day, and had been there as much as

two hours when defendant arrived, and that deceased had a supply of liquor that testimony shows he purchased from Carlo Salyers,· and that he had made the trip there for that purpose. The parties talked and sang songs until nearly 11:30, when defendant, after the moon had gone down and ceased to shine, concluded to continue his journey to see his sick sister, and both he and deceased left the house and went into the yard at the same time. But one other person was out of the house in the yard, or on the porch, at that time, and what then occurred is testified to by defendant and his witnesses and by deceased in his dying declaration.

Defendant stated in his testimony that deceased was intoxicated at the time he arrived at the home of his uncle, and indulged in some talk typical of that of an intoxicated person, but he stated no fact indicative of anger towards him, or any other person, on the part of deceased, and that, when he got out of the house into the yard, preparatory to leaving, deceased asked him to take him to the residence of Arch Smith, who lived near by, but which defendant declined to do; that "one word brought on another," when deceased said, "I guess I will take you tonight," and then said "I will just take the horse," to which defendant objected, and that defendant at that time had his hands in his pockets and said, "Yes, G—— d—— you, I will," and, "As he went to jump back he drew his hand and grabbed at me and tore my shirt and I ducked down, he hit at me with his knife and I ran about 14 or 15 steps telling him to stop," whereupon defendant fired the fatal shot which penetrated decedent's body under his left arm and came out just below the right shoulder blade. The pistol was what is known as a Colt's manufacture and .45 caliber. The witness, who was either in the yard or on the porch, corroborated defendant's account of the difficulty in part, but he did not see the shooting, because he turned to go into the house before the pistol was fired. Mrs. Carlo Salyers and one of her daughters likewise corroborated defendant's testimony as to what occurred to about the same extent as did the other witness, but neither one of them saw the shooting.

When defendant returned to the residence of his uncle after leaving at the time of the shooting, he called to the members of the household to bring a light and search for a knife, and which request on his part was the first thing he said upon his return, and it appears to have

been the first notification to any member of the household that he had returned. The search revealed a knife lying near to deceased, but whether he had it at the time he was shot, or that he had a knife at all on that occasion, is not disclosed by any other testimony, nor was there any proof that the knife so found was owned or possessed by deceased. One of defendant's witnesses who claims to have seen deceased just before he was shot said that he was moving towards defendant "a little grain, just slipping a little grain," and which we interpret as a slow and deliberate movement on his part, and none of defendant's witnesses except himself testified to deceased having a knife in his hands. On the contrary they all said that they saw nothing in his hands.

The dying declaration was testified to by Justus Begley, a brother of deceased, who was with the latter from about 6 o'clock the next morning after he was shot until he died some five days later. The declaration to which he testified was repeated on several occasions during that time, and it was last repeated by deceased about 30 minutes before he died, and at a time when he knew that dissolution was almost immediate. The substance of it was that he had gone to the house of Carlo Salyers about 6:30 p. m. on that day and had gotten some whisky, which was consumed by himself and all, or practically all, of the others present, including defendant (and defendant admitted that he took at least one drink), and that at about 11:30 both he and defendant left the house, and, when they got in the yard, deceased said: "I came here by myself and you came by yourself. I am going to Arch Smith's, you go away by yourself and I will go away by myself"; that he (deceased) was standing with his hands in his pockets when defendant started to draw his pistol; and then deceased removed his hands from his pockets and raised them up as defendant pointed the pistol at him and made the remark to the latter, "Do not do that," when defendant fired the shot that produced the fatal wound. At that juncture witness asked deceased what he was doing at the time defendant drew his pistol, to which deceased replied, "I wasn't doing anything." Defendant was not apprehended until the following September, when he notified the officers, but which was after arrangements had been made for bail.

There are a number of circumstances appearing in the record more or less detracting from the good-faith

story told by defendant and some of his witnesses, and upon the whole case we are not prepared to say that the verdict is flagrantly against the evidence. If the jury believed the dying declaration, which we hold was competent, the killing was altogether inexcusable.

■ Under this ground it is argued that the court erred in admitting the dying declaration, but which we have seen in disposing of ground 1 cannot be sustained. It is also insisted in support of this ground that the court erred in permitting the witness, Arch Smith, to describe the character of knife that deceased owned without showing that it was lost or misplaced. Without passing upon the merits of that argument, it is sufficient to say that the description given by the witness was that of an ordinary pocketknife, and which did not contradict any description given by defendant as to the character of knife deceased drew on him, he having given no such description and it is impossible for us to see how is could operate to defendant's prejudice though erroneous, but which latter question we do not determine.

■ The only objection made under this ground is one concerning the reasonable doubt instruction. It was in the usual form as approved many times by this court, but it did not direct the jury in specific terms to acquit defendant, if it entertained a reasonable doubt as to "any material fact necessary to establish his guilt," but only directed an acquittal "if upon the whole case you have a reasonable doubt" of his having been proven guilty. In other words, it is insisted that the usual reasonable doubt instruction, so many times approved by this court, is not sufficient, but should also expressly say to the jury that defendant is entitled to an acquittal, if the jury entertain a reasonable doubt as to *any fact necessary to establish his guilt*. Such instructions are sometimes so drafted, and, when done, they do not receive the condemnation of this court, but we have been able to find no opinion wherein it was held that it was incumbent upon the court to so instruct the jury. On the contrary, we repeat that the general instruction to the effect that defendant should be acquitted unless the jury believed him guilty beyond a reasonable doubt, fully protects defendant's rights, and is all that he is entitled to. So drafted, it follows the language of section 238 of the Criminal Code, and which we held was all that was required in the cases of Charles v. Commonwealth, 222 Ky. 99, 300 S. W. 357;

Roark v. Commonwealth, 221 Ky. 253, 298 S. W. 683; Fleming v. Commonwealth, 217 Ky. 485, 290 S. W. 339, and others referred to in those opinions.

The identical objection now under consideration was presented in the Roark case, wherein the same insistence with reference to the reasonable doubt instruction was therein made as is contained in this ground, and in denying it we said: "So long as there is presented to the jury the defendant's rights as defined in section 238, Criminal Code, he cannot complain, and we have often written that it would be better practice to give this instruction in the language of the Code itself." This ground, therefore, must be denied.

In support of ground 4, defendant filed with his motion for a new trial the affidavit of L. C. Trent, a member of the jury that convicted him, and in which the affiant said "that the verdict is not an expression of the jury in that he and the other jurors quarreled and he was intimidated and threatened before he agreed to make the verdict therein, and that said verdict is not his individual and personal verdict." In the first place, the affidavit states no fact upon which the court could act, if it were the rule that a verdict could be so attacked, but which is untrue. What was the subject-matter of the jury quarrel, or what were the threats or intimidating acts that occurred in the jury room, or by whom made; the affidavit is entirely silent; and the statements in the excerpt therefrom contain nothing more than the conclusions of the affiant. But, section 272 of the Criminal Code expressly provides that "a juror cannot be examined to establish a ground for a new trial, except it be to establish that the verdict was made by lot." That section has been construed to mean exactly what it says in numerous cases in this court, among the latest of which are: Morgan v. Commonwealth, 188 Ky. 458, 222 S. W. 941; McDowell v. Commonwealth, 207 Ky. 680, 269 S. W. 1019; Wolf v. Commonwealth, 214 Ky. 544, 283 S. W. 385; Clark v. Commonwealth, 201 Ky. 620, 257 S. W. 1035; and others referred to in those opinions. There is, therefore, no merit in this ground.

Perceiving no error prejudicial to the substantial rights of the defendant, the judgment is affirmed.