## Davis v. Commonwealth.

(Decided Nov. 20, 1934.)

S. Y. TRIMBLE, W. O. SOYARS and FOX & GORDON for appellant.

BAILEY P. WOOTTON, Attorney General, and H. HAMILTON RICE, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY CREAL, COMMISSIONER— Reversing.

Jointly indicted in the Christian circuit court with Roy Davis, Gether Long, and Alvan McIntosh for the murder of Wallace Myers, Ewing Davis, on separate trial, has been found guilty as charged in the indictment and his punishment fixed at life imprisonment.

By this appeal he is seeking a reversal of the judgment, and as warranting such action upon the part of this court has assigned the following grounds: (1) That the court committed prejudicial error in admitting incompetent evidence over his objection; (2) that the instructions given by the court are erroneous, and that the court erred in not giving other instructions to which appellant was entitled; (3) that the verdict is flagrantly against the evidence. Further grounds argued for reversal involve the selection and conduct of the jurors and the failure to grant a new trial on the ground of newly discovered evidence, but, since the judgment must be reversed on other grounds, and as these alleged errors will not likely occur in the event of another trial, it will be unnecessary to consider them.

It is charged in substance in the indictment that the defendants named therein, and other persons to the grand jury unknown, confederated and banded together and entered into a conspiracy to bring about and procure the death of Wallace Myers; that pursuant to, and in furtherance of, such conspiracy, the defendants and other persons acting with them shot and killed Myers.

The killing of Myers grew out of labor troubles at Empire mine No. 6 in Christian county. Roy Davis, brother of appellant, and other coal miners who had been at work in this mine went out on a strike. The owners of the mine were attempting to carry on operations and had employed other miners. Two or three weeks previous to the homicide, Roy Davis and other

strikers assembled on the highway leading to the mine for the purpose, as they claim, of peaceably persuading men employed in the mine from continuing their work until the labor disputes were settled. According to their version of the matter, armed deputy sheriffs and guards who were accompanying the laborers to the mine assumed a threatening attitude toward them, and they thereupon consulted with, and were advised by, county officials that they had a right to bear arms openly so long as they did not molest any one. Thereafter Roy Davis and others bearing arms assembled on the highway and attempted to talk to laborers who were being transported by automobile to the mine, but according to their evidence they were ordered away by the armed deputies and guards, which orders were obeyed. Although there is some evidence that some of the mine guards drew their machine guns upon the strikers and the latter used abusive language and made some demonstrations, no further trouble occurred at that time. A few days thereafter, on May 5, the striking miners again assembled at the same point, but without arms. The deputy sheriffs and mine guards accompanying the working miners were armed. So far as the record discloses, no further picketing was attempted between this and the time of the homicide which occurred on June 7. There is some evidence that there was a local union of the United Mine Workers of America, of which Roy Davis was president. There is other evidence indicating that such union no longer existed, but, be that as it may, there were meetings of the unemployed miners and possibly others in a building owned by Roy Davis, and he presided over these meetings. There is evidence that after the last attempt to talk with the laborers on the highway and before the date of the homicide, shots were fired at and toward the coal tipple and the opening of the mine by persons hidden behind trees and in ravines some distance from the mine, and that these shots were fired from high-powered rifles. There is no evidence that appellant attended any of the meetings of the strikers or others in the building owned by Roy Davis or that he was ever with them when picketing or attempting to talk with the men who were at work in the mine. Roy Davis and others testified that he was not with the unemployed miners on May 4 when they attempted to talk with the employed miners who were on their way to work, but on that date he and his wife

and sister, accompanied by Goldie Sisk and appellant, went in his car to Evansville, where he purchased a high-powered rifle and some ammunition. On the night before the homicide, a meeting was held at the place of Roy Davis, at which, according to evidence for the commonwealth, plans for the following day were discussed; however, there is no evidence that appellant attended this meeting.

Jim Lewis testified that on the afternoon of the homicide he went to the home of Roy Davis about 2:30 for the purpose of securing some flour which he had heard Davis was dispensing for the Red Cross. On his way he was overtaken by Alvan McIntosh, who accompanied him on to Roy Davis'. When he arrived there, he saw "Coon" Long sitting on the porch, and asked him if Roy was there. Long told him that Roy was not at home, but, while talking with Long, he glanced through a door or window and saw him in the house. His suspicion was aroused by this, and he concluded that they did not want him to know Roy was there, so he started away, but on leaving met with Mrs. Davis and conversed with her for a few minutes. When a short distance from the house he discovered Ewing Davis, John Morgan, and another man whom he did not know in a field going toward the scene of the shooting, and appellant was carrying some kind of high-powered rifle.

About 4 o'clock, persons secreted behind trees and in depressions on the hillside opposite the mine opened fire upon the mouth of the mine and upon persons thereabouts. This, as we understand, was about the time the laborers would be coming out of the mine. The evidence indicates that the shooting continued for several minutes and that scores of shots were fired. Myers, who was guarding the mine and who was armed, started in the direction from whence the shots were coming. He was followed by Polk Devers, who, after the firing started, procured a machine gun from the office at the mine and went across the railroad tracks and followed a line of fencing to a corner. Myers started around the corner, and immediately after doing so received one or more fatal gunshot wounds. Devers stated that the shots were coming from a hickory tree at the foot of the hill, as was evidenced by smoke following the shots; that, after Myers fell, he saw Ewing Davis and Willie Barefield leaving the hickory tree and going in the direction of Mannington; that they were the only men he saw

that he could tell anything about; that he was about 150 yards from them.

A number of empty cartridges were found at the foot of the hickory tree referred to by this witness. Empty shells, tracks, and other signs indicated that a number of men had been on the hill near the shooting. Albert Stokes testified that, when the shooting began, he was in an automobile in front of the tipple; that he got out and took a .44 Winchester from John Chambers, and went up the hill where the shooting was coming from; that, when he got in view of the trees from whence the shots were coming, he saw three men, and one of them was Ewing Davis.

Dewey Hammons stated that he attended a meeting at the "local home" owned by Roy Davis the night before Myers was killed. When asked if the group gathered there belonged to the union, he stated that there was no union, but that Roy Davis acted as president of the "organization"; that Roy Davis said that "the men would have to take up for themselves; that Southall and Barry Brown had double crossed them; that they gave them permission to carry guns upon the road and refused to let them do it; he was guarding there at the mine; that there was a big fellow guarding there at the mine that they would have to get rid of;" that Davis was referring to Polk Devers, who was a night guard, and further said:

"They would have to get shet of him; that if they could not stop the men on the road, they would stop them down there."

He further testified that arrangements were made that night for him to go over on the hill the following afternoon to stand watch and keep anybody from coming in the back way; that he went up on the hill opposite the mine between 3 and 4 o'clock in the afternoon, and that John and Jack Morgan, Clark Crick, Andrew Claxton, and some man whom he did not know were there; that, so far as he knew, John Morgan had no arms, but that Crick and Jack Morgan were armed. When asked what arrangements had been made with reference to the signal to start shooting, he replied, "I don't know; they said there would be a signal fired by Max Long." He stated that he was stationed on the west side of the hill, and Long and others were on the east side; that the shooting started on the east side, and he saw Myers,

who was across the railroad at the corner of a fence, staggering, and he immediately left; that the shots were from a big hickory tree on the east side of the hill; that he did not see the men down at that point, but that John Morgan told him Lem Davis, Ewing Davis, Paul Davis, Alvan McIntosh, and either Goldie Sisk or Willie Barefield were down there. He further stated that he said nothing to any one concerning the matters about which he testified until he made a ''confession'' after he had been put in jail.

Witnesses were permitted to testify about a search of Roy Davis' premises a few days after the shooting and the finding of a box of cartridges hidden under the fender of an old Ford automobile which was sitting at a spring a short distance from the house and barn. The cartridges were of the same caliber and character as those fired at the time Myers was killed, as was evidenced by the empty shells and the bullets found there.

Appellant testified that he was not present and took no part in the shooting, but was some miles away at the time; that he never attended any of the meetings held at Roy Davis' place, nor was he ever with the men assembled there or elsewhere, and did not enter into a conspiracy with his codefendants or with other persons to molest or injure the working miners, guards, or the mine property. He is strongly corroborated in his statements by a number of other witnesses introduced in his behalf. He admitted that he went to Evansville with his brother when the latter purchased a rifle and some ammunition, but stated that he had nothing to do with the purchase or any agreement or understanding concerning it.

Before passing to a discussion of the alleged errors in the admission of evidence and in instructions given to the jury, it may be said that, notwithstanding the conflict in evidence and questions made concerning the credibility of witnesses for the commonwealth and the improbability of the truth of some of the things related by them, it was sufficient to take the case to the jury and to support the verdict, since the weight to be given the evidence and the credibility of the witnesses are matters exclusively within the province of a jury. From the foregoing, it will be seen that the question turns on the credibility of the witnesses for the commonwealth, and it was for the jury, and not for this court, to determine that matter.

Counsel for appellant attack as incompetent all evidence as to acts or statements of the strikers or union men and their associates prior to the homicide on the ground that there was no evidence to show that appellant was present on any of these occasions, and also attack certain items of evidence concerning utterances and conduct of others out of the presence and hearing of appellant.

It would be impracticable to attempt to detail all the evidence called in question. While some of the specific items of evidence pointed out may have been incompetent and, to say the least, were immaterial, none were of such a character when viewed in the light of the record as a whole as would be calculated to prejudice appellant's rights. As has often been pointed out by this court, evidence to establish a conspiracy must necessarily assume a wide range. The utterances and conduct of alleged coconspirators before the ultimate accomplishment of the conspiracy which tend to establish that one standing accused of crime was a party to the conspiracy are admissible against him and are competent, provided the existence of such conspiracy has theretofore been established or is later shown by the evidence. Fletcher v. Commonwealth, 239 Ky. 506, 39 S. W. (2d) 972; Morgan v. Commonwealth, 188 Ky. 458, 222 S. W. 940; Skillian v. Commonwealth, 206 Ky. 586, 268 S. W. 299; Owens v. Commonwealth, 181 Ky. 378, 205 S. W. 398.

Unquestionably the evidence introduced by the commonwealth was sufficient to establish a prima facie case of conspiracy. Appellant admits going to Evansville with his brother when the latter purchased a rifle and ammunition. On the afternoon of the homicide, and shortly before it occurred, he and other armed men were seen a short distance from his brother's home and going from that direction toward the scene of the shooting. There is ample proof that he was present and participating in the shooting and was seen going therefrom with others. This evidence clearly tends to establish that he was a party to the alleged conspiracy. It is therefore apparent that the court did not err in admitting acts and declarations of alleged coconspirators prior to the time of its accomplishment.

Counsel's insistence that the evidence as to finding cartridges on the premises of Roy Davis some days

after the shooting is incompetent is well founded; however, there is no merit in the contention that this evidence is incompetent because it was discovered by illegal search. It is well settled in this jurisdiction that one party may not complain of the illegal search of the premises of another. It is incompetent on the other ground urged by counsel. There is no evidence whatever to indicate that appellant ever had these cartridges in his possession or that he hid them at the place where they were discovered, and the fact that some other person placed them there after the homicide would not be competent as against him.

It is earnestly insisted by counsel for appellant that the instructions given by the court are erroneous; however, we find that most of the instructions follow the forms often approved by this court, and our conclusion is that the instructions given properly submit the issues in so far as they go.

It is argued by counsel that, since the evidence, including the admission of witness Dewey Hammons, clearly connects him with the alleged conspiracy and the commission of the homicide, the court should have given further and appropriate instructions under the provisions of sections 241 and 242 of the Criminal Code of Practice. Concerning the evidence bearing on this question, it certainly requires no further recital to demonstrate that the witness Hammons was an accomplice, and, it is admitted by the Attorney General that, if this be true, instructions concerning the evidence of an accomplice should have been given. Among other cases cited and relied on by counsel for appellant as supporting the theory that the court erred in this particular is that of Hendrickson v. Commonwealth, 235 Ky. 5, 29 S. W. (2d) 646, 647. In that case, after discussing the circumstances under which it was the duty of the court to give instructions under sections 241 and 242 of the Criminal Code of Practice, it is said:

"But it might be said that, under the provisions of sections 340 and 353 of the Criminal Code of Practice, this court would be authorized in a proper case to disregard the error in failing to instruct with reference to the testimony of an accomplice if, upon the entire record, no substantial right of the defendant was prejudiced thereby; but our answer thereto is that we have searched our

decisions in vain to find any case, where the same error was relied on, in which this court disregarded it and affirmed the judgment under the authority conferred by either of the latter two sections. It might be that, if the testimony of the accomplice was overwhelmingly corroborated by other testimony, and to such an extent as that the facts testified to by him were overwhelmingly proven without his testimony, or if the accomplice testified only to collateral and remote facts having but little value in determining defendant's guilt, then, and in every such case, the court would be authorized to affirm the judgment of conviction, not withstanding the error of the court in failing to instruct the jury as to the weight to be given the testimony of the accomplice.''

In the case of Fox v. Commonwealth, 248 Ky. 466, 58 S. W. (2d) 608, it was held that the failure to give instructions under the sections of the Code in question was not reversible error, where the guilt of the accused was established by independent, ample, and substantial competent evidence, and the accomplice's evidence merely consisted of a denial that it was he who cut deceased. In this case, as in the Hendrickson Case, supra, the testimony of the accomplice was not of a trivial nature. His was the strongest evidence tending to establish the conspiracy and, coupled with the evidence of Jim Lewis, to connect appellant with it and to show that he was actually present and participating in the accomplishment of a conspiracy. We are therefore constrained to hold that an instruction under the provisions of the Code hereinbefore referred to should have been given.

It is further argued by counsel for appellant that the court erred in failing to instruct the jury under what circumstances they might consider as against appellant acts and statements of the other alleged coconspirators made out of his presence and hearing. While there seems to be some confusion of opinion respecting this question, the weight of authority indicates that such an instruction should have been given. See Day v. Commonwealth, 173 Ky. 269, 191 S. W. 105; Skillian v. Commonwealth, 206 Ky. 586, 268 S. W. 299, and cases therein cited. The latter case sets out the character of instruction that should be given in the event of another trial.

432

For the reasons indicated, the judgment is reversed and cause remanded for a new trial and proceedings in conformity with this opinion.