## Davis v. Commonwealth.

(Decided Dec. 17, 1937.)

D. HOLLENDER HALL and J. C. BURNETTE for appellant.

HUBERT MEREDITH, Attorney General, and W. OWEN KELLER, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE BAIRD—Affirming.

Kile Davis and Beckham Allen were indicted in the Knott circuit court for the crime of the murder of Woodrow Allen. At the March term of that court a severance was demanded; Kile Davis was tried and convicted of voluntary manslaughter and his punishment fixed at twenty-one years in the penitentiary. He appeals. He relies upon the following errors for reversal: (1) That the argument and conduct of the commonwealth's attorney was improper; (2) that there was both actual and implied bias in the minds of certain jurors who tried the case; (3) that the court erred in failing to instruct the jury to find the defendant not guilty; and (4) that the verdict was not supported by either the law or the evidence and was so flagrantly against the law and the evidence to show that it was the result of passion and prejudice.

We will discuss the alleged errors in their order. The first error claimed is that the commonwealth's attorney made improper remarks in his argument to the jury. Counsel practically concedes that the conduct of the commonwealth's attorney was not sufficient to justify a new trial. We find nothing in the statements made by the commonwealth's attorney that was improper or of a prejudicial nature. Everything that the commonwealth's attorney said necessarily was drawn from the evidence, or could have been deduced therefrom. We have often held that the commonwealth's attorney may denounce crime in strong terms without

committing an error. The only expression made by the attorney, that was not entirely deducible from the evidence, was this:

"We have in this county too much murder, and the law of self-defense is worn out long ago."

We see nothing prejudicial in those remarks. We have often said that the commonwealth's attorney may denounce crime in his speech and may refer to facts within the knowledge of the public in general to illustrate a point or warrant a conclusion. Murphy v. Com., 263 Ky. 347, 92 S. W. (2d) 342; Clark v. Com., 209 Ky. 51, 272 S. W. 11; Tyree v. Com., 212 Ky. 596, 279 S. W. 990; and many other cases similar.

There is another complaint, that the commonwealth's attorney committed a prejudicial error by presenting to the jury the clothing of the deceased before the clothing was introduced in evidence. We find that the evidence does not support that contention. The clothing that the deceased wore when he was shot was identified and made a part of the evidence. Jack Compton, a witness for the commonwealth, stated in substance that he was present at the time Woodrow Allen, the deceased, was stripped of his clothing and he saw their condition; he "put them in a paper meal poke or flour poke," and gave them to Bud Dobson. He said the clothing was in the same condition as when removed from the dead man's body. Bud Dobson stated he was present when the dead man was stripped, and his clothing was put in a "poke" by Jack Compton and was then taken to Coet Dobson's, who kept them. Coet Dobson stated that he had retained possession of them. There was an objection that the clothing was testified to in the presence of the jury; that, of course, would necessarily follow because there could be no other way to identify the clothing except for the witnesses to do so in the presence and hearing of the jury. We see nothing to prejudice the rights of the defendant because the commonwealth's attorney had the clothing in his hands in the presence of the jury before they were fully identified, and at that time was endeavoring to show that the clothing was in the same condition as they were just after the shooting. In doing that the commonwealth's attorney passed them to the jury over the objection of the defendant's attorney. We are unable to see any error in that, prejudicial to the rights of defendant.

It has been the rule in this jurisdiction for years that the commonwealth's attorney may show the jury the clothing of the deceased. In the case of Carroll v. Com., 83 S. W. 552, 26 Ky. Law Rep. 1083, the court said:

"The clothes worn by the deceased were introduced as evidence with the view of showing the location of the wounds inflicted. They had been soiled with the blood of the deceased. It was proper to introduce them as evidence, but it is urged that the commonwealth's attorney erred to the prejudice of the appellant, because during his argument he held them before the jury. We do not think the defendant can complain of that act, because the commonwealth's attorney had the right to comment on the holes which had been produced by the knife in the hands of the appellant for the purpose of showing the jury that they sustained other testimony in the case. The clothes were part of the evidence."

The attorney's remarks to the jury and his acts as herein referred to, under no circumstances, could be prejudicial to the rights of appellant.

It is insisted that there was both actual and implied bias in the minds of certain jurors who tried the case. Two of the jurors, both of them women, Eulanda Combs and Lony Calhoun, after they had rendered a verdict of guilty, filed their affidavits, stating that one Willie Sawyers, who was on the jury with them, influenced them to return a verdict of guilty, because he told them when they went to the jury room for deliberation that he knew all about the case, and what his verdict would be before he went into the jury room; that he discussed things in the jury room that were not brought out in evidence; that he said "he knew more about the case than the witnesses"; and that "the said juror undertook and did state to them that the defendant after the killing and after the deceased was brought to his home, went to another house and to bed and was very drunk, etc." Sawyers denied making any such statement.

It is an established rule of law that "a juror can not be examined to establish a ground for a new trial, except it be to establish that the verdict was made by lot." Section 272, Criminal Code of Practice. The verdict of jurors cannot be impeached in that way. Wolf

v. Com., 214 Ky. 544, 283 S. W. 385; Salyers v. Com., 229 Ky. 153, 16 S. W. (2d) 509; Mills v. Com., 223 Ky. 165, 3 S. W. (2d) 183, and cases cited therein. That alleged error is ungrounded. It is further claimed that the verdict of Lony Calhoun, one of the same jurors referred to, was brought about on account of the relationship to the deceased. To support that contention the affidavit of one John Hale is filed, which is as follows:

> "The affiant, John Hale, says that Denver Calhoun, husband of Lona Calhoun, who served as a juror upon the trial of Kile Davis for the killing of Woodrow Allen, is an uncle of Wilts Noble and that Wilts Noble is the husband of Millie Allen, mother of the deceased, Woodrow Allen."

From that affidavit it is difficult for us to conclude whether there is any relationship either by consanguinity or affinity. Section 210 of the Criminal Code of Practice provides that:

> "A challenge for implied bias may be made * * * if the juror be related by consanguinity, or affinity."

Borrowing an expression that we find in the brief of the learned attorney for the commonwealth, we will say that "in this case the consanguinity is nebulous, and the affinity somewhat esoteric."

In the case of Cox v. Com., 255 Ky. 391, 74 S. W. (2d) 346, one juror was shown to be a second cousin of the wife of the brother of the deceased and his wife's uncle married a niece of the deceased. We decided that such relationship was not close enough to warrant a reversal. In that case the juror was related to the deceased by neither consanguinity or affinity. See Wolfe v. Com., 229 Ky. 385, 17 S. W. (2d) 219, 64 A. L. R. 263; Sizemore v. Com., 210 Ky. 637, 276 S. W. 524.

It is insisted that the court erred in failing to instruct the jury to find the defendant not guilty, and that the verdict was not supported by either the law or the evidence and was so flagrantly against the law and the evidence as to show that it was the result of passion and prejudice. We will discuss those two questions together. A summary of the facts adduced by the commonwealth is necessary: The defendant Beckham Allen, accused with him, and Woodrow Allen were to-

gether on Thanksgiving Day, November, 1936; there was with them one Alonzo Shepherd. They were together about 4 o'clock at Henry Sparkman's who lived on what is known as Patton Fork, a tributary of Laurel Fork Creek. They came together from that place to W. M. Compton's store, after dark where they stopped. They were all drinking. Kile Davis purchased 50 cents worth of cartridges for a .38-caliber pistol. Beckham Allen tried to buy cartridges for a .32-caliber pistol, but failed to get any. They left the store, and Kile Davis and Woodrow Allen went on in front to the schoolhouse, at the mouth of Baker Creek, a tributary that runs into Laurel Fork. When they came to the schoolhouse they stopped and talked some. Alonzo Shepherd, who was along, went on ahead to a foot log. He said he could not understand their conversation, but heard four shots fired from a pistol. He did not look back; paid no attention to the shots until he heard Beckham Allen say: "I wouldn't do that if I were you." He then saw Woodrow Allen and Kile Davis wrestling or something; thought they might be doing something, so he started back, and before he got to where they were, they all jumped up and ran up the hill to the road. Woodrow Allen caught hold of Beckham Allen and threw or knocked him down at or about the corner of the fence. There was a paling fence running around above the schoolhouse. It was some five or six steps from the paling fence to where the killing took place. Woodrow Allen also had Kile Davis down. Shepherd pulled Woodrow Allen off of Beckham Allen and then Beckham went up the road, and Alonzo Shepherd said to Woodrow, "Stay with me and don't have no trouble," and Woodrow said: "Dog gone if I don't do something." He saw no pistol until he saw the blaze of it; that the blaze of the gun came from Kile Davis; that he did not count the number of shots, but that he figured about three shots. He saw Woodrow Allen when he fell; that Kile Davis was about a couple of steps away when he shot; Woodrow Allen did not have hold of Davis at that time, but was going toward Davis when he shot. The trouble occurred after night, but he could recognize a person about fifteen or twenty steps. On cross-examination Shepherd stated that they chased one another to the palings across from the schoolhouse, and then Woodrow Allen started up toward the road toward Kile Davis, who was standing in the county road.

Davis fired three shots and stopped and started to run; that Woodrow turned toward him; then Davis fired about three shots more. Woodrow stooped down and picked up something, but he did not know what it was. Davis then wheeled around and told him not to come, fired two or three shots, and the last shot he fired, Woodrow fell; that one time he heard three shots and then later three more shots. There was not much time between them. He heard Davis tell Woodrow to stop about the time the last shot was fired. He saw Davis and Beckham Allen after the firing had begun and each had a pistol. He thought that Davis first shot three shots in the ground, but he was not certain about that. The fourth shot was towards Woodrow Allen. The first three shots were very fast. It was the last shot that killed him. After Woodrow was shot, he saw some blood on his face coming out of his nose; that he was then lying on his back. He stayed with the body until someone came. Will Compton, the storekeeper, came in about fifteen or twenty minutes. The killing occurred about 100 yards from Compton's store. Davis left immediately after the shooting, but Beckham Allen stayed. Davis walked away pretty fast. He said nothing after the killing, but later on he heard Davis say: "Boys, you see I had it to do." He made this remark just after Woodrow was killed. He did not know what Davis did with the pistol. He could not state that the deceased had a rock or anything in his hand when he was shot.

Will Compton stated that Kile Davis, Woodrow and Beckham Allen and Alonzo Shepherd came to the store about dark and they were drinking. They traded some, but he did not know what they bought. He was asked if they bought some shells. His answer was: "They never from me." It was insisted that he knew who they did buy shells from, and his answer was: "I never seed them buy any." In about thirty minutes after they left he heard something like twelve or fifteen shots. He went down to where the killing occurred; saw the deceased, who was shot, lying on his back and seemed to be dead. His chest was bloody. He then took the body to Beckham Allen's. He saw the body the next day. He opened the coffin and saw where he was shot. There was a bullet hole along about the left nipple. There were marks on his face, hands, and wrists. When he went to where the killing occurred, he saw what Beckham Allen said was the dead man's hat. It was about

thirty-two steps from the body and near a coal house. They seemed to be on friendly terms when at his store. They stayed at the store about an hour.

Jack Compton stated that he was the son of William Compton, the owner of the store; that these parties came to his father's store about dark. He went in the store with them. Davis bought from him 50 cents worth of .38 special cartridges. Woodrow Allen was not present when he bought the cartridges nor did he hear the conversation between him and Davis about the cartridges. Beckham Allen was present and asked if they had any .32 special cartridges, but they did not have any. He left before they left the store and went to his home. He lived in about a half or a quarter of a mile. He heard several shots, but could not estimate them. The next day he went to where the corpse was. The body had on the same clothing it had when shot. When he first saw him he examined the wounds on his body; found holes in the body; there was a hole through his shirt and undershirt that went on into his breast. He found a wound on his right knee. His left arm from along about the elbow up to the shoulder was turned "kinda of purple"; he discovered a hole in the back of his head; he ran his finger in the hole, and when it came out it had blood on it. The blood was all sticky back there and he could not tell much about it. He did not look at the place on the back of his head. There was a mark over the left eye running up to the top of his head and straight around above his ear about the size of a pencil. He was a brother-in-law of Woodrow Allen— married his sister.

Henderson Shepherd stated that he was a school teacher; that he was acquainted with the grounds and premises where the boy was killed. He told where the schoolhouse was in reference to the mouth of the creek; that the body was somewhat like 90 feet on a diagonal line from the schoolhouse to where he was informed the body lay in the road. He saw the body at Beckham Allen's. He stripped the body and found or saw where the shot had entered the body. His left arm and shoulder were blue down to his elbow and there was a bruise across the side of his head. A little strip, purple and red, ran over his eye to the top of his head as broad as his little finger; saw some blood at the place where they showed him where Woodrow was killed. The blood was about six feet from the coal house and the coal house

was about 50 feet from the schoolhouse and there was blood there; that Woodrow Allen was a strong man and weighed about 170 pounds.

Ballard Howard stated that he was at the store of Will Compton on the night the boy was killed; he heard shots, but did not count them; he thought there was as many as from eight to fifteen. In twenty or thirty minutes Davis came and told him of the killing. He then went to the body; went with it to Beckham Allen's. It was dark and he did not notice any of the wounds.

Walter Howard stated that he heard the shots after dark and there must have been twelve or fifteen shots in all fired. Davis came down in about twenty or thirty minutes and informed him of the killing. The shots that he heard were about three different spells of it. One shot cracked different to the rest of them. The last two or three cracked as if it were a double action pistol and one shot cracked "kinda dead." There was another shot or two after that. He said the last spell of shots that he heard were some three or four or perhaps five shots fired.

Jack Compton was recalled and asked to identify the clothing, and several other witnesses were used for that purpose.

This was in substance the testimony of the commonwealth. The evidence was sufficient to authorize the court to refuse a peremptory instruction. It was satisfactorily shown that Woodrow Allen was killed by the defendant Davis; that there were many shots fired for some reason. After his death a hole was found in the back of his head and other wounds upon his body, indicating there had been a serious and bloody conflict. At least he had received wounds from some source. This defendant, together with Beckham and Woodrow Allen, had been together and had been knocking each other down, or at least had been in a struggle, that ended in the death of Woodrow Allen; none of the other parties being injured. The court committed no error in refusing the peremptory instruction.

The remaining question is: Was the verdict in the whole case flagrantly against the evidence enough to show that it was the result of passion and prejudice? The defendant admits that he shot and killed the deceased. The question then arises: Was he excusable

under the law of self-defense and apparent necessity when he did so? In support of that contention the defendant and Beckham Allen constitute his witnesses. No other person except Alonzo Shepherd attempts to relate the facts leading up to the killing.

The substance of the evidence of the defendant Davis is that he, Beckham, and Woodrow Allen were together about 4 o'clock on Thanksgiving Day. They were all drinking. He and Beckham Allen had a pistol each. He had a .38 special and Beckham a .32. They were all good friends. In fact, Beckham was his brother-in-law and an uncle of Woodrow Allen, the deceased. They went together to Will Compton's store; reached there about 4 o'clock. He, Beckham, and Woodrow Allen then went together to Patton Fork. There they joined Alonzo Shepherd. They then came back down the road to the store of Compton and remained there until about 8 o'clock. They again left altogether and went down to the schoolhouse just below the store. There the defendant told Beckham this: "I believe I will try my gun out to see how she will do." He said he had just traded for it that day. He shot his pistol twice and then gave it to Beckham, who also shot it about twice. Beckham gave the pistol back to him. He took out the empty shells and reloaded it with the cartridges he had purchased at the store from Jack Compton. He had bought sixteen extra cartridges there. They then started walking on when Woodrow Allen came up and said: "Give me that gun; and I said, 'No, you got no use for it, I haint got no cartridges.'" Woodrow Allen then knocked him down and got on him evidently trying to get the pistol. The defendant then reached back and gave the pistol to Beckham. Beckham then started running off with it. Woodrow then, got off of him and ran after Beckham. He caught Beckham and got him down. The defendant then turned and came back to where Woodrow and Beckham were and grabbed the pistol away from Beckham and started running down the road with it. Woodrow then left Beckham and went running to the defendant. The defendant told Woodrow to stop, but he did not do so. He then shot three times, he said, to scare Woodrow, thinking that would stop him. He did not stop. Then Woodrow, the defendant stated, "sorta" bent down to the ground and picked up something that looked like a rock. When he got straight he shot and killed him. The de-

fendant stated that he did everything he could to stop Woodrow; that after Woodrow got Beckham down he went back and got the pistol away from Beckham and then told Woodrow not to come toward him. Before he shot, he told him to stop, and when he stooped down and picked up what he thought was a rock he shot him. On cross-examination he stated that he "swapped" for the pistol that he shot Woodrow with that day with Beckham at Beckham's home; that he bought the cartridges from Jack Compton for which he paid him 50 cents. He bought sixteen cartridges; that he was drinking some; that there had been a quarrel before the shooting at a point near the schoolhouse; that the first trouble they had was near the coal house. At that point Woodrow had him down. He did not know how Woodrow got a lick in the back of the head; that when Woodrow had him down he (Woodrow) struck him with his fist as he did also Beckham; that he made some bruises on defendant's face, but he showed them to no one; when he went to the store after the killing and talked with Will Compton he never told him that Woodrow had him down, nor did he show him or anyone the bruises on his face. During the fight they had at the coal house he saw nothing in the hands of Woodrow. If he had a pistol he did not see it. Defendant in substance stated that the first fight was about 35 or 40 feet from the schoolhouse. He further stated that Woodrow and Beckham were fighting at one time; that the fight lasted, he thought, about a minute; when he saw they were fighting he (the defendant) came back to get his pistol from Beckham; that after he got his pistol he ran about 30 yards down the road when he saw Woodrow coming. On cross-examination he said he was sober and remembered everything that happened; when he shot Woodrow he had a rock in his hand, but he did not know what kind of rock it was. He thought it was as large as his fist. All the time he was running down the road he had the pistol in his hand. When he shot, Woodrow was 10 or 15 feet from him; that he only shot at him one time; that during the time he shot six times; but all the shots were down by the side of him except the one that killed him. During the trouble there were ten shots fired. He shot eight and Beckham two.

Beckham Allen stated in substance about the same as the defendant, except he did not see Woodrow stoop and pick up anything before he was shot.

This is in substance the testimony offered by the defendant.

It is shown that all of these parties were under the influence of liquor and no doubt drunk. The real facts of the rencounter in our judgment have not been fully related concerning the actual trouble that occurred between them. The jury no doubt was aware of that. There was no explanation by any one as to how Woodrow received the hole that the witness Compton stated was in the back of his head. There was a struggle and fight between them before the shooting. The jury were the sole judges of the facts. It was their province to pass upon the evidence and circumstances as to the guilt or innocence of the defendant.

The condition of the body after it was shot refutes and contradicts the testimony of both the defendant and Beckham Allen, that Woodrow was at all times the aggressor.

There was also found on his body and especially upon his left arm and shoulder wounds; in fact, the arm and shoulder were purple and blue down to the elbow. There was also a bruise on the side of his head and over the left eye, extending to the top of his head, straight around above his ear. These wounds are unexplained. The wound in the head indicated in a degree that it might have been made by a shot or a bullet from the defendant's pistol. The seeming anxiety and effort to keep the .38 special in the hands of either Beckham or himself was significant. The fact that he and Beckham had a pistol and both endeavored to secure cartridges and both tried out the .38 pistol, but refused to permit Woodrow to do so, in fact, denied having cartridges, was significant also. From these facts and circumstances the jury had a perfect right to conclude that the defendant was not justified in the killing. It was their province to refuse to accept his version and that of Beckham Allen or either of them as to how the fatal wound was inflicted.

It is an established rule of this court that where there is any evidence, however slight, tending to show the guilt of the accused, the case should go to the jury. Lickliter v. Com., 255 Ky. 471, 74 S. W. (2d) 918; Simmons v. Com., 207 Ky. 570, 269 S. W. 732; Blanton v. Com., 245 Ky. 546, 53 S. W. (2d) 952; Hatfield v. Com., 264 Ky. 721, 95 S. W. (2d) 562.

It is also a rule of this court that a verdict is not palpably against the evidence when it is reasonable for the jury to find from the proven facts and circumstances that the defendant was guilty. Shepherd v. Com., 236 Ky. 290, 33 S. W. (2d) 4, 6.

In that case we said:

"It is not possible for this court to know the basis upon which the verdict was rested, but when the evidence affords any fair and reasonable ground upon which it might be sustained, it cannot be said as a matter of law that the result reached was palpably against the proof adduced."

It was altogether the province of the jury to believe one witness over another or one set of circumstances and refuse to believe other witnesses. In fact, the credibility of the witnesses must be determined by the jury. There is no complaint of the instructions. Therefore, in our opinion, the facts and circumstances heard by the jury justify and authorize the verdict rendered. Clair v. Com., 267 Ky. 363, 102 S. W. (2d) 367; Noble v. Com., 267 Ky. 809, 103 S. W. (2d) 258.

Wherefore the judgment is affirmed.