**Glen HICKS, Jr., Appellant,**

v.

**COMMONWEALTH of Kentucky,**
**Appellee.**

Supreme Court of Kentucky.

March 29, 1984.

Rehearings Denied July 5, 1984.

Michael A. Wright, Deputy Public Advocate, Frankfort, for appellant.

Steven L. Beshear, Atty. Gen., Virgil W. Webb III, Asst. Atty. Gen., Frankfort, for appellee.

STEPHENSON, Justice.

Glen Hicks, Jr., was tried and convicted of the murders of Steven Sharkey and Raymond Holbrook. He was sentenced to life imprisonment. Hicks appeals his conviction. We affirm.

The bodies of Sharkey and Holbrook were found at their residences stabbed to death. The residences were fairly close. There was testimony that Hicks was seen near the residences, and he had a large cut on his right thumb. There was testimony that Hicks had quarreled with and threatened both Holbrook and Sharkey at a party the night before the bodies were found. Samples of blood from the victims and Hicks were collected together with blood

stains from garments from the victims' homes.

The most damaging evidence for the Commonwealth was the testimony of a serologist from the state crime laboratory. The serologist used a technique called electrophoresis in which a current is passed through blood and the proteins are separated. The blood of the victims and Hicks was categorized into enzyme types. Each of them had a different enzyme pattern. Blood with Hicks' enzyme pattern was found on a sweat shirt near the Sharkey house and from floors, towels and pants from the Holbrook home. The testimony was that only four people in one thousand have the same blood characteristics as Hicks.

Prior to trial, Hicks informed the trial court that the Commonwealth planned to use the serologist and filed a motion asking the trial court to provide funds for employment of expert witnesses in order to adequately prepare for trial on the evidence concerning blood samples. The motion was denied. Later defense counsel advised the trial court that he had engaged two expert witnesses to assist him but needed funds to defray their travel expenses etc., and renewed the motion. Again the motion was denied. These rulings by the trial court constitute Hicks' first assignment of error.

Hicks contends that RCr 9.46, regarding appointment of expert witnesses, and KRS 31.110, providing that a needy person is entitled "(b) to be provided with the necessary services and facilities of representation including investigation and other preparation . . . ," entitled him to the services of expert witnesses and that failure to authorize these funds constituted reversible error.

We have only considered this proposition once before in *Young v. Commonwealth,* Ky., 585 S.W.2d 378 (1979), and affirmed the denial of such assistance. Hicks relies upon a statement made by this court in *Young* that this court readily concedes "that indigent defendants are entitled to reasonably necessary expert assistance."

■ We are of the opinion that "reasonably necessary" is the proper standard to be considered in this respect. We are of the further opinion that Hicks in this instance has failed to meet this standard. The "reasonably necessary" standard is also applied in the Federal courts. See *United States v. Durant,* 545 F.2d 823 (2 Cir.1976).

■ Here Hicks' attorney had consulted out-of-state experts about the problem, but made no showing as to what manner he expected to be assisted in cross-examining the serologist. The trial courts are not required to provide funds to defense experts for fishing expeditions. Hicks' lawyer had been in contact with the experts and knowing the tests performed by the serologists should have had some idea of the manner in which these expert witnesses were material to the defense. The trial court was not apprised of any showing to reach the "reasonably necessary" standard, and we have not been so advised by brief or oral argument.

From a review of the record it is manifest that Hicks was not prejudiced by the denial of funds for expert witnesses. A medical doctor testified for the defense. His testimony revealed an expert knowledge of the test which he described as extremely accurate. We are not advised as to why this medical doctor did not suffice for expert assistance. In addition, the record shows defense counsel received documents to assist him from his proposed experts and conducted a thorough cross-examination of the serologist.

It is implicit in the "reasonably necessary" standard that some discretion rests with the trial court. Here there is no showing that this discretion was abused.

The second assignment of error concerns the alleged concealment of bias on the part of one of the jurors. During the *voir dire* the usual questions were propounded regarding knowledge of the case and relationships to the deceased, the defendant, and the witnesses. Then the trial court asked the jurors if they recognized a close personal relationship with any of the Com-

monwealth's witnesses with no response from the jurors. The jury was sworn and at the conclusion of the trial returned a verdict of guilty and recommended life imprisonment for Hicks.

On motion and grounds for a new trial, Hicks presented affidavits from two of the jurors that a female juror stated, "I shouldn't be in here because I'm a close or very close friend of Sharkey's mother." According to testimony of one of the jurors at the hearing, this juror did not participate in the discussion other than voting for guilt.

One of the affidavits stated that "[t]he boy should have had 12 people with open minds"; the other stated he was bothered by his conscience and wanted to clear his conscience and tell what happened. This is a curious attitude displayed by two jurors who also voted for a guilty verdict.

This case illustrates the wisdom of the long-standing rule in this Commonwealth that a jury verdict cannot be impeached through the testimony of jurors as to what occurred in the jury room, except to show that the verdict was made by lot.

RCr 10.04 provides: "A juror cannot be examined to establish a ground for a new trial, except to establish that the verdict was made by lot."

■ Hicks was free to establish by *competent* evidence that a juror did not truthfully answer on *voir dire* in order to conceal bias. He cannot attempt this by the evidence of another juror as to anything that occurred in the jury room. Such evidence is incompetent. See *Davis v. Com.*, 271 Ky. 180, 111 S.W.2d 640 (1937), and *Grace v. Com.*, Ky., 459 S.W.2d 143 (1970).

The authorities relied upon by Hicks, *Pennington v. Com.*, Ky., 316 S.W.2d 221 (1958), and *Tayloe v. Com.*, Ky., 335 S.W.2d 556 (1960), are not applicable. There the record or testimony other than that of a juror revealed such bias as would justify challenge for cause. Such is not the case in Hicks' situation.

■ The remark in the dissent about uncontradicted evidence seems to say that the Commonwealth has some duty to go forward in situations such as this. The burden is on the defendant to make a showing entitling him to relief. Here he did not identify or produce the juror who could provide the best evidence as to bias. The statements of the two jurors without the testimony of the woman juror are worthless even if the test is what occurred in the jury room rather than an objective test as to a showing of bias as a matter of law.

The trial court properly overruled the motion and grounds for a new trial.

The judgment is affirmed.

AKER, GANT, STEPHENSON, VANCE and WINTERSHEIMER, JJ., concur.

LEIBSON, J., dissents and files a dissenting opinion in which STEPHENS, C.J., joins.

LEIBSON, Justice, dissenting.

In *Ice v. Commonwealth* and *McQueen v. Commonwealth,* both rendered February 16, 1984, I have protested against indifference to jury selection that included jurors obviously biased. I continue to urge this Court to realize the importance of the constitutional right to a neutral jury—the "impartial jury" guaranteed by the Sixth Amendment of the United States Constitution and Section XI of the Kentucky Constitution.

Appellant has been found guilty of murder and given a life sentence. The uncontradicted evidence presented on the motion for new trial was that one member of the jury stated during jury deliberations that *she should not be in the jury room because she was a very close friend of the victim's mother.*

In my view, the trial court abused its discretion in failing to grant a new trial when thus confronted with the juror's bias. Even the juror knew that "she should not be in the jury room." The principle involved is too important to reason around it.

The majority opinion has found two reasons why the constitutional mandate of an impartial jury has no application. It finds

that the questions of the jury on voir dire were not sufficiently precise to require this unqualified juror to respond and it takes the view that we are required by RCr 10.04 (jurors are not permitted to impeach their own verdict) to close our eyes to the uncontradicted truth regarding this juror's disqualification. On the contrary, the questions asked on voir dire were more than sufficient to generate a response from any fair-minded juror disclosing the relationship to the victim's mother. Furthermore, if RCr 10.04 means what the majority says it does, it is constitutionally impermissible.

Questions on voir dire regarding acquaintanceship with witnesses for the Commonwealth who were brothers and relatives of the deceased, followed by excusing jurors who were, followed by questions as to "any reason why a juror might be prejudiced against the defendant 'because of the nature of the charges or otherwise,'" should have been sufficient to .trigger a response. Finally, the trial judge asked:

"And as my last question. Can you think of any matter that you should call to the court's attention which may have some bearing on your qualifications as a juror or which may prevent you from rendering a fair and impartial verdict based solely upon the evidence in my instructions?"

It is evident that the disqualified juror knew she should have responded to this question because she later told her fellow jurors that she should not be sitting on the jury. She did not have the "mental attitude of appropriate indifference" that the constitution calls for. *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). Here, as in *Pennington v. Commonwealth*, Ky., 316 S.W.2d 221, 223 (1958), "credulity would be stretched to the breaking point to say that the juror's close relationship to (the victim's mother) ... does not practically, or within limits of reality, bring the juror under the classification of being impliedly or presumably biased ..." Yet, her vote was necessary both for the conviction and the sentence.

Further, we cannot ignore the potential inherent in this close relationship between a juror and the victim's mother to taint the entire jury. Elementary principles of group dynamics make it very likely that such a relationship would generate hostility in the group towards the accused. The fact that other jurors came forward to disclose this disqualification convinces me that the jurors, if not the trial court which refused the new trial, were aware of the taint on the verdict.

RCr 10.04, which the majority uses as a shield against evidence of juror bias in this case, is but a restatement of the longstanding rule against permitting jurors to impeach their verdict. This rule has always related to permitting jurors to testify about *the reasons for their decision,* not a collateral matter. *Ruggles v. Commonwealth,* Ky., 335 S.W.2d 344 (1960).

Black's Law Dictionary, 5th Ed., p. 678 defines "impeachment of verdict," as an "(A)ttack on verdict because of alleged improprieties in the jury's deliberations or conduct." "Conduct" means conduct during deliberations. *Jones v. Commonwealth,* Ky., 450 S.W.2d 812 (1970); *Grace v. Commonwealth,* Ky., 459 S.W.2d 143 (1970).

Here the testimony of jurors was not offered to prove the verdict was improperly arrived at, but offered to show that one of the jurors was not qualified to serve and failed to disclose the disqualification.

The majority opinion states:

"One of the (juror's) affidavits stated that '(t)he boy should have had twelve people with open minds'; the other stated he was bothered by his conscience and wanted to clear his conscience and tell what happened. This is a curious attitude displayed by two jurors who also voted for a guilty verdict."

Since I share the view that even if the appellant is guilty he "should have had twelve people with open minds," it also "bother(s) my conscience" that he did not. I find nothing curious in the attitude of these two jurors. On the contrary, we must cease to view the constitutional re-

quirement of a neutral jury as a procedural hurdle in the race to convict the guilty and open our eyes to its intrinsic value. It is the essential for justice under the law.

I would reverse the conviction and remand the case for a new trial.

STEPHENS, C.J., joins in this dissent.