341 S.W.3d 99 (2011)
Jason Lee MULLIKAN, Appellant,
v.
COMMONWEALTH of Kentucky, Appellee.
No. 2009-SC-000519-MR.
Supreme Court of Kentucky.
June 16, 2011.
*101 Emily Holt Rhorer, Department of Public Advocacy, Frankfort, KY, Counsel for Appellant.
Jack Conway, Attorney General of Kentucky, James Coleman Shackelford, Assistant Attorney General, Office of Criminal Appeals, Attorney General's Office, Frankfort, KY, Counsel for Appellee.
Opinion of the Court by Justice CUNNINGHAM.
Appellant, Jason Lee Mullikan, lived with his parents in Maysville, Kentucky. Soon after Kent Fields moved in next door, Mullikan became strangely paranoid that Fields was trying to harm him. He believed that Fields had attempted to ram his vehicle and also suspected that Fields had killed his cat. Mullikan was further convinced that Fields was breaking into his home and trying to poison his water. On September 18, 2008, a state trooper came to Mullikan's home to collect a bottle of water which Mullikan claimed tasted funny.
On that same day, Mullikan saw Fields walking down the street. He approached Fields from behind and attacked him. Apparently, Mullikan's purpose in attacking Fields was to deter him from continuing with what Mullikan believed was a design to harm him. An individual by the name of Frank Fryman helped to break up the fight after Mullikan had gotten the worse of it. The intervention of Fryman fed *102 Mullikan's paranoia to the point that he also believed Fryman was conspiring with Fields to do him harm. Mullikan then ran into Fields's home with Fields in hot pursuit. Inside the house, Mullikan grabbed a Samurai sword and threatened Fields by saying, "I'm going to kill you." He exited the house, swinging the sword at both Fields and Fryman. When Mullikan heard sirens and the police approaching, he ran to his home where the police arrested him. In the course of the arrest, Mullikan threatened and made obscene gestures toward the police. He also spat on the face of one of the officers. An EMS on the scene cleaned the officer's face, and other law enforcement personnel sprayed him with a decontaminant spray.
Mullikan was indicted and convicted of two counts of first-degree wanton endangerment for chasing Fields and Fryman with the Samurai sword; one count of second-degree burglary for his unauthorized entry into Fields's home; one count of third-degree assault for spitting on the police officer; and two counts of third-degree terroristic threatening for allegedly threatening to kill Fields and Fryman. In accordance with the jury's recommendation, the trial court sentenced Mullikan to five years for each count of wanton endangerment, five years for third-degree assault, ten years for second-degree burglary, and twelve months for each count of terroristic threatening, for a total term of imprisonment for twenty years.
Mullikan raises nine grounds on this appeal. We find that only onewhich will be addressed lasthas merit.

I. ANALYSIS

1. There was no Double Jeopardy Violation in Mullikan's Convictions for First-Degree Wanton Endangerment and Third-Degree Terroristic Threatening of Same Victims.
This issue is unpreserved, but we have long held that "double jeopardy questions may be reviewed on appeal, even if they were not presented to the trial court." Cardine v. Commonwealth, 283 S.W.3d 641, 652 (Ky.2009), quoting, e.g., Terry v. Commonwealth, 253 S.W.3d 466, 470 (Ky. 2008).
As Mullikan points out, prior Kentucky double jeopardy precedent holds that a defendant cannot be properly convicted of both wanton endangerment and terroristic threatening of the same victim because "the terroristic threat is included in the wanton endangerment." Watson v. Commonwealth, 579 S.W.2d 103, 104 (Ky. 1979), overruled on other grounds by Commonwealth v. demons, 734 S.W.2d 459, 461 (Ky.1987). See also Commonwealth v. Black, 907 S.W.2d 762, 763 (Ky.1995). Such precedent pre-dates our landmark decision in Commonwealth v. Burge, 947 S.W.2d 805 (Ky.1996), in which we abandoned the "single impulse" or "same conduct test" in favor of deciding questions of whether convictions on two offenses were prohibited under the double jeopardy clause using the Blockburger test. See Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). See also Burge, 947 S.W.2d at 809-11.
Under a proper Blockburger analysis, "Double jeopardy does not occur when a person is charged with two crimes arising from the same course of conduct, as long as each statute `requires proof of an additional fact which the other does not.'" Id. at 809, quoting Blockburger, 284 U.S. at 304, 52 S.Ct. 180. Properly applying the Blockburger analysis, we are forced to overrule our precedent holding that convictions on both wanton endangerment and terroristic threatening of the same victim are barred under the double jeopardy clause.
*103 The elements of first-degree wanton endangerment and third-degree terroristic threatening are quite different. First-degree wanton endangerment requires that "under circumstances manifesting extreme indifference to the value of human life, [the defendant] wantonly engages in conduct which creates a substantial danger of death or serious physical injury to another person." KRS 508.060(1). Third-degree terroristic threatening, on the other hand, does not require that the defendant engage in conduct creating such serious risks to another person "under circumstances manifesting extreme indifference to the value of human life." On the contrary, it simply requires that the defendant threaten to commit any crime likely to cause death, serious physical injury or substantial property damage. KRS 508.080(1).
Therefore, terroristic threatening requires a threat to commit a crime, but wanton endangerment does not require such a threat. And wanton endangerment requires actual conduct placing others at serious risk, but terroristic threatening does not require such actual conduct or such actual serious risk. Consequently, convictions on both offenses do not violate KRS 505.020 because terroristic threatening is not "included within" wanton endangerment since terroristic threatening is not "established by proof of the same or less than all the facts required to establish the commission of wanton endangerment.
Because each conviction requires proof of a fact that the other conviction does not, Mullikan's convictions for both wanton endangerment and terroristic threatening of Fields and Fryman do not constitute a double jeopardy violation under a proper Blockburger analysis.

2. Trial Court Did Not Abuse Discretion in Denying Mullikan's Request for DNA Testing or Fingerprinting of Water Bottle.
Before trial, Mullikan moved the trial court to require DNA and fingerprint testing on the water bottle that police had collected from him. The trial court denied this motion, partly because of the collateral nature of the inquiry and partly because of concerns that such testing could not be completed by the time of trial. Mullikan contends that this was error because such testing might have indicated that the water bottle that KSP tested for harmful substances was not the same water bottle Mullikan had asked them to test. Such DNA and fingerprinting testing was not reasonably necessary for Mullikan's complete defense. See Hicks v. Commonwealth, 670 S.W.2d 837, 838 (Ky.1984); Smith v. Commonwealth, 734 S.W.2d 437, 447-48 (Ky.1987); Sommers v. Commonwealth, 843 S.W.2d 879, 884-85 (Ky.1992).
Mullikan was clearly able to present, as part of his defense, his assertion that he believed Fields was trying to poison him. The truth of this asserted belief is simply not pivotal to Mullikan's guilt or innocence on the charged offenses. As we explain later in this opinion, even if Mullikan was correct that Fields had tried to poison him, there was no allegation of an imminent threat to Mullikan at the time of the sword-brandishing incidents which would justify his criminal actions. So DNA or fingerprint testing would have been unlikely to result in relevant evidence of such probative value as to outweigh any concerns such as undue delay or jury confusion. We find no abuse of discretion in the trial court's refusal to order DNA or fingerprint testing of the water bottle. See CR 26.02 and KRE 102.

3. Trial Court Did Not Abuse Discretion in Controlling Examination of Witnesses.
Before trial, the trial court ruled that neither Mullikan, who elected to question *104 witnesses himself, nor the prosecution would be allowed to approach witnesses during questioning at trial. The trial court directed that all examination of witnesses must be conducted while the examiner was seated at counsel table. Despite Mullikan's objection that the jury would draw negative inferences from this restriction, the trial court elected to impose this limitation, citing allegations of Mullikan's history of assaults.
The trial court allowed Mullikan and counsel to conduct voir dire and make opening statements and closing argument while standing at the lectern. Mullikan and counsel were also allowed to approach the bench during bench conferences and to otherwise move freely about the courtroom during trial.
We also note that the Commonwealth's exhibits presented to witnesses were first passed to an attendant, who was designated to pass such exhibits to witnesses, and that Mullikan's exhibits were handed to witnesses by standby counsel. In other words, neither side was allowed to directly approach witnesses while they testified at trial.
Mullikan claims that these courtroom controls deprived him of his rights to due process and a fair trial. He argues that, despite the fact that the same limitations were imposed on the prosecution and that he was not actually physically restrained, these limitations suggested to the jury that he was guilty of the charged offenses or, at least, was a dangerous man. He also complains that these types of limitations would not have been imposed on an attorney representing him, and that these limitations prevented him from being an active participant in the trial.
Despite these complaints, we note that Mullikan has cited no legal authority indicating that he has a right to approach witnesses during questioning. On the other hand, the trial court has inherent authority to control the trial proceedings and specific authority under KRE 611(a) to control the mode of interrogation of witnesses. This rule of evidence provides the trial court with ample authority to exercise reasonable control over the interrogation of witnesses so as to protect them from harassment and undue embarrassment.
In light of the trial court's evenhanded treatment of both sides, we discern no abuse of discretion in these precautionary limitations. It appears to us that the trial court properly exercised its discretion to allow both sides a fair trial while taking precautionary steps to ensure witness safety. See Allen v. Commonwealth, 286 S.W.3d 221, 230 (Ky.2009).

4. No Palpable Error Arose from Witnesses' Brief References to Mullikan's Prior Incarceration and Trial.
Mullikan conducted witness examination himself and testified in his own defense. Some witnesses, particularly during their cross-examination by Mullikan, made references to Mullikan's prior stints in jail and to a prior trial in another case. Admitting that the issue is unpreserved, Mullikan contends that palpable error arose as a result of two witnesses' references to his prior trial and incarceration on other charges. We disagree with his contention and conclude that he is not entitled to relief on this issue.
Even though prior bad acts are not admissible to prove criminal disposition, Mullikan could have requested an admonition to this effect; but he failed to do so and the brief references to an earlier incarceration and prior trial did not amount to palpable error. KRE 404(b).
The references to Mullikan's prior incarceration and trial occurred during the testimony of police officers, Major Ron Rice *105 and Sergeant Leo McKay. We note that the references made by Rice to Mullikan's prior trial and incarceration were elicited by Mullikan himself during cross-examination of Rice. When Mullikan asked Rice whether he had told the officer of his belief that Fields had broken into his home, Rice replied that Mullikan had not. Mullikan then asked Rice whether he had had a conversation with Rice outside the post office in which Mullikan complained about Fields, and whether Rice recalled a conversation about a complaint concerning a minor verbal altercation. Mullikan then asked if Rice recalled what the complaint or verbal altercation was about, and Rice answered in the affirmative. Upon Mullikan's further prodding to reveal the content of this complaint or verbal altercation, Rice replied, "It seems that the gentleman had allegedly called you a nickname that you had acquired while incarcerated at the detention center at one point, and he referred to you by this nickname and that upset you."
Sgt. McKay testified on direct examination that he went with Mullikan to the hospital so that Mullikan could be treated for his facial injuries, and that Mullikan told McKay that he had been assaulted by the undercover police officer who the police were paying to poison his water. McKay further related that Mullikan told McKay that he went to the undercover officer's house for a confrontation when the officer struck Mullikan, and that Mullikan grabbed a sword from a neighbor's house to defend himself. The prosecutor then asked McKay whether Mullikan had told him that Mullikan thought he had been poisoned by a particular individual. McKay testified that Mullikan said that a certain individual had tried to poison him in jail, and that local police officers were part of that poisoning conspiracy.
Then, during Rice's rebuttal testimony, the prosecutor asked Rice whether Mullikan had ever complained that Detective Michael Palmer had broken into Mullikan's home. Rice stated that Mullikan's complaint against Palmer was that Detective Palmer was not who he said he was. Then Mullikan again cross-examined Rice and asked if he had ever told Rice that Palmer had committed perjury, and Rice replied that he had looked into Mullikan's allegations that Palmer had perjured himself in a prior trial involving Mr. Mullikan.
Despite Mullikan's complaints that these references unfairly conveyed to the jury during the guilt phase the fact that he had been in trouble in the past, we conclude that no palpable error arose because most of these references to earlier encounters with the law were elicited by Mullikan himself. Further, the references were brief and likely of little effect in light of the overwhelming evidence against Mullikan. Also, they were intertwined with Mullikan's efforts to present his belief of a police conspiracy against him. In short, we discern no "manifest injustice" from any alleged error here. So any error stemming from the witnesses' brief references to Mullikan's prior incarceration and trial was not palpable.

5. Mullikan Was Not Entitled to a Directed Verdict on the Third-Degree Assault Charge.
Despite having failed to bring this specific issue before the trial court, Mullikan contends that he was entitled to a directed verdict on the third-degree assault charge, based on what he contends to be a lack of evidence of physical injury. We disagree.
Admittedly, the police officer did not require hospitalization or require treatment other than a decontaminant spray at the scene; but the Commonwealth introduced evidence through the police officer *106 whom Mullikan spat upon that he suffered an impairment of his physical condition because he felt physically ill after the incident. And even if the jury did not accept the officer's feeling ill as a physical injury caused by Mullikan's conduct, the jury could also have reasonably concluded that Mullikan's conduct was an attempt to cause a physical injurysuch as the spread of a bodily-fluid-borne disease even if no physical injury actually resulted. So we reject Mullikan's argument that he was entitled to a directed verdict on third-degree assault as defined by KRS 508.025(1)(a)(1), intentionally causing or attempting to cause physical injury to a police officer.

6. Omission from Jury Instruction on Third-Degree Assault of Element of Knowledge that Officer Acting Within Official Capacity was Harmless Under Facts of Case.
Mullikan tendered an instruction on third-degree assault that differed from the one given by the trial court. He argues that he was entitled to a directed verdict on the third-degree assault charge, and that the trial court's instruction on this charge was erroneous because it failed to require the jury to determine whether Mullikan knew the victim was a police officer acting within the course of his official duties when Mullikan spat on him. The Commonwealth counters that any error was harmless because Mullikan testified that he knew who the police officer was.
We adjudge there was error with the instruction. However, this error was harmless. As the Commonwealth points out, Mullikan testified that he knew the victim was a police officer acting in his official capacity. So we can confidently state, beyond a reasonable doubt, that the jury's verdict on this charge would not have changed if the trial court had instead given the jury the proper instruction containing this element of the offense. We conclude that the trial court's error in omitting the element of knowledge of the officer's official capacity was harmless beyond a reasonable doubt, despite our presumption that erroneous jury instructions are prejudicial. Commonwealth v. McCombs, 304 S.W.3d 676, 681 (Ky.2009).

7. Trial Court Properly Denied Requested Instruction on Choice of Evils.
Mullikan requested a jury instruction on the defense of choice of evils. The trial court denied these requests, but instructed the jury on self-protection defenses with initial aggressor and provocation qualifications. Mullikan contends that the trial court erred in refusing to give his tendered instruction on choice of evils. We agree with the trial court and the Commonwealth that Mullikan was not entitled to such an instruction because of the lack of evidence of a threat of imminent injury.
KRS 503.030(1) provides that conduct that would otherwise be considered unlawful may be justified "when the defendant believes it to be necessary to avoid an imminent public or private injury greater than the injury which is sought to be prevented by the statute defining the offense charged...." But Mullikan's tendered jury instruction did not require the jury to find that Mullikan believed his conduct was necessary to avoid an imminent injury. Mullikan's tendered instruction simply asked the jury to find whether he believed his conduct was necessary to avoid an injury.
We also believe the trial court properly denied an instruction on choice of evils based upon Senay v. Commonwealth, 650 S.W.2d 259 (Ky.1983), in which we clarified that evidence of a defendant's "general fear" stemming from earlier events was *107 not sufficient to justify an instruction on choice of evils. To be more precise, to be entitled to a choice of evils instruction, the record must contain evidence that the defendant perceived an immediate threat of injury at a time very close toif not entirely contemporaneous withhis allegedly unlawful action. Id. at 261.
Here, Mullikan may have generally feared that he would be poisoned or otherwise harmed by Fields or others at the time he attacked Fields, but there was no evidence that Fields had made any specific threats to Mullikan immediately before Mullikan grabbed him. Nor was there any evidence of any specific or imminent threat from Fryman or others, despite Mullikan's belief that perhaps Fryman was working with Fields to harm him. Furthermore, Mullikan's testimony that many of his actions were intended to "frighten" Fields and Fryman undercuts his argument that he believed his actions were necessary for the purpose of defending himself against an imminent physical threat. We agree with the trial court that Mullikan was not entitled to a choice of evils instruction.

8. Trial Court Properly Refused to Give Mullikan's Tendered Instruction on Mistake of Fact.
Mullikan asserts that the defense he wished to present was that he had mistakenly believed that Fields had earlier attemptedand would again attemptto kill him, and that he mistakenly believed Fryman was working with Fields in this endeavor. Accordingly, Mullikan tendered an instruction on mistake of fact. His tendered instruction stated he would not be guilty of the charged offenses if "he reasonably believed" he was threatened with break-ins or other harm and "therefore did not form the intention to commit the [charged] offenses" and "that he believed that this actions were necessary in self-defense and that belief was not wantonly or recklessly held." But the trial court declined to give this instruction, stating that an instruction was warranted on self-protection, but not on mistake of fact.
We conclude that the trial court's refusal to give the tendered mistake of fact instruction was proper. While, undoubtedly, mistake of fact is governed by a subjective standard and there is no requirement to show that a mistake of fact be reasonable for this defense to be available, a mistake of fact is not a defense to a charge unless the mistake "would support a defense of justification" or otherwise show that the charged offense, as defined by statute (including express defenses and mental state requirements), could not have been committed. See Walker v. Commonwealth, 127 S.W.3d 596, 608 (Ky.2004); KRS 501.070.
Even if Mullikan had been correct that Fields and Fryman had attempted to kill him on some earlier occasion, or that they would do so at some unspecified time in the future, he would not be justified in engaging in otherwise criminal conduct unless he believed it necessary to avoid an imminent injury. KRS 503.030. And as previously discussed, there was no evidence of threats of imminent injury when Mullikan accosted Fields on the street or when Mullikan entered Fields's home and began brandishing a sword and making verbal threats. Therefore, the trial court was correct in declining to issue Mullikan's tendered instruction on mistake of fact as a defense.

9. Testimony in Penalty Phase Describing Facts and Circumstances Underlying Mullikan's Prior Convictions was Unduly Prejudicial and Merits New Penalty Phase.
KRS 532.055(2)(a) states in part that, in the sentencing stage in felony cases, "[e]vidence may be offered by the *108 Commonwealth relevant to sentencing including: (1)[m]inimum parole eligibility, prior convictions of the defendant, both felony and misdemeanor; (2)[t]he nature of prior offenses for which he was convicted...." It is clear from the statute that the legislature intended for juries to be able to consider more information about a defendant's prior criminal history than just the identification of "prior convictions." This is made clear by the statute also allowing evidence as to the "nature of prior offenses."
Here, during the penalty phase, testimony was presented by Lieutenant Justin Horch of the Maysville Police Department who gave information concerning Mullikan's prior convictions of fourth-degree assault, second-degree fleeing or evading a police officer, and resisting arrest. Lt. Horch, however, was not the investigating officer of this case. He testified that the previous offenses took place at the Family Dollar Store near the K-Mart area where, at the time, Mullikan was working at Little Caesars, which was located next door. Lt. Horch further testified that a disagreement with one of the employees there had ended with Mullikan putting his hands around a woman's neck. He stated he believed the lady to be approximately sixty to seventy years old. All of the information about which Lt. Horch testified was acquired from police reports or other witnesses.
There are two problems which immediately come to mind when reviewing this evidence. First, the testimony of the officer was clearly hearsay. KRE 602 states in part that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Secondly, we must address whether the information that was given is beyond the scope of the statutory term of the "nature of prior offenses."
This Court has been struggling for the last fifteen years, through a series of cases, to define permissible evidence which may be introduced describing the "nature of prior offenses." We began this quest in the case of Robinson v. Commonwealth, 926 S.W.2d 853 (Ky.1996). In Robinson, the victim of a prior assault was allowed to testify at length as to the specifics of that crime. We held that such testimony went beyond the permissible scope of the statute and stated, "[A]ll that is admissible as to the nature of a prior conviction is a general description of the crime." Id. at 855. Of course, that case failed to put an end to this dilemma as there is hardly any difference between "general description of the crime" and the "nature of [the] prior offense[s]."
Two years after Robinson, we held that the information recited at the sentencing stage from the records of the defendant's convictions went beyond the limitations set forth both in Robinson and KRS 532.055(2)(a). See Hudson v. Commonwealth, 979 S.W.2d 106 (Ky.1998). In the Hudson case, the witness testified as to the circumstances of each conviction from information included on the warrants and uniform citations. In the case of Brooks v. Commonwealth, 114 S.W.3d 818 (Ky.2003), this Court upheld the introduction of information regarding prior misdemeanors which had been gleaned from the criminal complaints. We distinguished that case from Robinson because no detailed testimony regarding the crimes was permitted.
Finally, we arrived at our latest word on this issue in Cuzick v. Commonwealth, 276 S.W.3d 260 (Ky.2009). As evidenced by the split vote of the Court in that case, we moved no closer to a clear definition of the "nature of prior offenses." The majority in Cuzick allowed information from the *109 citation to be read to the jury at the sentencing stage. The evidence was that, in the previous burglary, the defendant utilized a baseball bat in breaking the glass and making the entry. Through a fractured Court, we held that the information regarding the prior offense could be provided to the jury.
This review of prior cases clearly reveals that we have failed to provide a discernable and workable rule of law to follow when introducing evidence of prior crimes at the sentencing stage. We recognize, by our previous struggles with this issue, that trial judges and prosecutors are in desperate need of a bright line rule. We attempt here today to provide them with a more easily followed rule regarding what is permissible in showing the "nature of prior offenses."
It seems to us that the nature of a prior conviction is closely akin, if not identical to, the definition of a prior conviction. In Robinson, this Court went to great lengths in attempting to define the "nature of prior offenses." The Court seemed to settle upon "description of a general character" as being as far as is allowed in dealing with these prior crimes. Therefore, we hold today that the evidence of prior convictions is limited to conveying to the jury the elements of the crimes previously committed. We suggest this be done either by a reading of the instruction of such crime from an acceptable form book or directly from the Kentucky Revised Statute itself. Said recitation for the jury's benefit, we feel, is best left to the judge. The description of the elements of the prior offense may need to be customized to fit the particulars of the crime, i.e., the burglary was of a building as opposed to a dwelling. The trial court should avoid identifiers, such as naming of victims, which might trigger memories of jurors who mayespecially in rural areashave prior knowledge about the crimes.

II. CONCLUSION
Therefore, we hold that the evidence in this case at the penalty phase was unduly prejudicial because it was not only inadmissible hearsay, but went beyond the statutory language of KRS 532.055(2)(a).
Based on the foregoing, we affirm the convictions but remand for a new sentencing trial consistent with the dictates of this opinion.
ABRAMSON, NOBLE, SCHRODER and VENTERS, JJ., concur. MINTON, C.J., concurs by separate opinion; and SCOTT, J., concurs in part and dissents in part by separate opinion.
MINTON, C.J., concurring:
I concur with the majority opinion, although I feel compelled to write separately to express my view that the Truth in Sentencing issues for which we reverse Mullikan's sentence were not properly preserved at trial. In my view, the trial court deserves credit for ably dealing with the arguments that were actually presented to it. I concur with reversing the sentence here because I believe the admission of factual details of prior crimes amounted to palpable error under Kentucky Rules of Criminal Procedure (RCr) 10.26. And I support adopting a clear rule prohibiting the admission of factual details of prior crimes under Truth in Sentencing.
The majority reverses this sentence because the trial court allowed into evidence in the sentencing phase details beyond the statutory elements of prior convictions. I do not recall there being an objection raised in the trial court to the overall level of detail presented concerning prior convictions. So I believe the issue was unpreserved. But I agree with the majority *110 that presenting factual details of prior crimes beyond their statutory elements should not be permitted. And such evidence amounted to palpable error because the description of Mullikan's grasping a store clerk's neck and choking her was quite prejudicial.
The record reveals that the basis of Mullikan's objections at trial was different from our grounds for reversing. At trial, Mullikan voiced simply an objection to Lt. Horch testifying to one specific detail: a victim's age. And the Commonwealth responded to Lt. Horch's testimony about the victim being sixty or seventy years old by stating that information about her age was inconsequential and that the victim was actually youngeressentially retracting the testimony about her age.
In addition to objecting to evidence of the victim's age, Mullikan raised what he termed a "hearsay objection" to Lt. Horch's testifying about Mullikan's prior convictions with the explanation that Lt. Horch was not the investigating officer. Lt. Horch, of course, lacked personal knowledge of the details surrounding Mullikan's earlier case. But because the Commonwealth represented that Lt. Horch had some general knowledge of the earlier case as the supervising officer, the trial court permitted Lt. Horch to testify further but ruled that he could only testify to his general knowledge about the offenses and not to specifics like the victim's age. Mullikan did not object further to the hearsay nature of Lt. Horch's testimony.
Although Mullikan often referred to Lt. Horch's testimony as hearsay in his brief to this Court, the parties did not argue hearsay or any exceptions or exclusions to the hearsay rule in their briefs to this Court. Mullikan argued in his brief to this Court that Lt. Horch's testimony was too detailedan argument he never made to the trial court apart from the specific objection to the victim's age.
In fairness to the trial process, I believe that we are reversing on grounds never argued to the trial judge and, to a large extent, perhaps also on grounds not fully argued to this Court. In light of the actual arguments presented to the trial court and our inconsistent precedent regarding the amount of detail that may be presented in Truth in Sentencing concerning prior convictions, I cannot fault the trial court's handling of the sentencing phase of this trial. I do agree that a new sentencing phase is necessary so that a jury can fairly determine an appropriate sentence without its judgment being clouded by factual details of prior convictions. For that reason, I concur with the majority opinion.
SCOTT, J., concurring in part and dissenting in part:
While I concur with the majority on the other issues, I must dissent as to the majority's conclusion that there was no double jeopardy violation with respect to Mullikan's convictions for first-degree wanton endangerment and third-degree terroristic threatening. Here, the defendant was convicted of both offenses for chasing Fryman with a sword. I dissent because the majority presumes no double jeopardy violation in this case without thoroughly applying this Court's decision in Commonwealth v. Burge, 947 S.W.2d 805 (Ky.1996). As a result, it is inconsistent with our precedent holding that convictions for both first-degree wanton endangerment and third-degree terroristic threatening of the same victim are barred under the double jeopardy clause.
I agree that Burge abandoned the "single impulse" or "same conduct"[1] test in *111 favor of deciding double jeopardy claims based upon the Blockburger test. However, the majority glosses over the clear directive of Burge "to determine whether the act or transaction complained of constitutes a violation of two distinct statutes and, if it does, if each statute requires proof of a fact the other does not." Id. at 811 (emphasis added). This directive stems from the Supreme Court's holding in Blockburger v. U.S., 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932), "that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." (Emphasis added). And we unanimously[2] recognized in Clark v. Commonwealth, 267 S.W.3d 668, 675 (Ky.2008), that such an evaluation determines whether a double jeopardy violation occurred:
If each statute requires proof of an additional fact which the other does not, then conviction under the two statutes in question does not violate double jeopardy. If, however, the exact same facts could prove the commission of two separate offenses, then the double jeopardy clause mandates that while a defendant may be prosecuted under both offenses, he may be convicted under only one of the statutes.[3]
(Citation omitted) (emphasis added). Moreover, we recognized that, even though an overlap of proof does not establish a double jeopardy violation of its own accord, "an inability to point to the requirement of at least one mutually exclusive fact in existence does." Id. at 677.
Here, although the elements of first-degree wanton endangerment and third-degree terroristic threatening are different,[4] the exact same evidence had to be used to satisfy the differing elements of the separate crimes. Specifically, without any reference to the record before us, the Majority assumes that Mullikan was convicted of first-degree wanton endangerment for chasing Fryman with a sword and third-degree terroristic threatening for allegedly threatening to kill him. However, such an assumption belies its own factual recitation, as Mullikan only verbally addressed Fields during this incident.[5] The only basis, then, for finding that Mullikan threatened to commit a crime upon Fryman would be via non-verbal communication, i.e. chasing him with a sword.[6] As a result, there is "no *112 viable distinction between" Mullikan's convictions of first-degree wanton endangerment and third-degree terroristic threatening with respect to Fryman, thereby yielding a double jeopardy violation. Id. at 678.
In summation, even though there are different elements of separate offenses, if the same evidence is used to satisfy the differing elements of the separate crimes, a double jeopardy violations resultseven under Burge. Because the exact same evidence had to be used to satisfy the differing elements of first-degree wanton endangerment and third-degree terroristic threatening with respect to Fryman, I dissent.
NOTES
[1] My double jeopardy analysis does not reinstitute the "same conduct" test, which "provides that, `if, to establish an essential element of an offense charged in that prosecution, the government will prove conduct that constitutes an offense for which the defendant has already been prosecuted,' a second prosecution may not be had." U.S. v. Dixon, 509 U.S. 688, 697, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993) (citing Grady v. Corbin, 495 U.S. 508, 510, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990)). Rather, it recognizes that a thorough application of the Blockburger test requires something more than sterile examination of statutory language.
[2] Justice Venters was not sitting.
[3] KRS 505.020 represents the codification of this analysis.
[4] The Majority notes that terroristic threatening requires a threat to commit a crime while wanton endangerment does not. Conversely, wanton endangerment requires actual conduct placing others at serious risk while terroristic threatening requires neither actual conduct nor actual serious risk.
[5] The Commonwealth implicitly concedes this point, as it points out that there were "separate acts regarding Kent Fields." Interestingly, the Commonwealth ignores this issue with respect to Fryman.
[6] While not raised by Mullikan, I question the sufficiency of the evidence to convict him for committing a terroristic threat upon Fryman, as I can find no case affirming such a conviction based on non-verbal communication. In fact, in Commonwealth v. Black, 907 S.W.2d 762, 763 (Ky.1995), this Court deemed the appellant entitled to a lesser included offense instruction because "it would be reasonable for a juror to believe that appellant verbally, but not physically, threatened the detective." (Emphasis added); But see Commonwealth v. demons, 734 S.W.2d 459, 462 (Ky.1987) (Vance, J., dissenting) (stating that "[t]he pointing of a firearm at another person, if it constitutes a threat, appropriately falls within the provision of K.R.S. 508.080 dealing with terroristic threatening"). I also note that the terroristic threatening charge was the subject of two questions from jury deliberations. Specifically, the jury inquired if terroristic threatening only applied to verbal threats and asked for a definition of "terroristic threatening."